Laura Salerno Owens, OSB # 076230
laurasalerno@markowitzherbold.com
David B. Markowitz, OSB # 742046
davidmarkowitz@markowitzherbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
(503) 295-3085

Nevin M. Gewertz (*pro hac vice* pending)
nevin.gewertz@bartlitbeck.com
Joshua P. Ackerman (*pro hac vice* pending)
joshua.ackerman@bartlitbeck.com
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4400
*Attorneys for Plaintiff VALMARC Corporation*

*Additional counsel listed after signature block.*

IN THE UNITED STATES DISTRICT COURT

FOR DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| VALMARC CORPORATION, a Massachusetts Corporation, <br><br> Plaintiff, <br><br> v. <br><br> NIKE, INC., an Oregon Corporation, <br><br> Defendant. | Case No. 3:21-cv-01556-IM <br><br> **COMPLAINT FOR TRADE SECRET MISAPPROPRIATION** <br><br> Jury Trial Demanded |

Plaintiff VALMARC Corporation, doing business as Vi3 ("Vi3"), brings this action against Nike, Inc. ("Nike"), and alleges as follows:

## Introduction

1.      This is an action for trade secret misappropriation arising out of Nike's theft of Vi3's proprietary anticounterfeiting and brand protection system.

2.      Counterfeiting is a widespread problem facing sneaker and apparel companies. Every year, counterfeit factories churn out millions of knockoff products, which flood markets in the United States and elsewhere, diluting companies' brands and depressing demand for genuine products. Nike, one of the world's most recognized brands, is a favorite target of counterfeiters. According to the *New York Times*, Nike is "widely considered to be the most counterfeited brand."

3.      Beginning in the mid 2000s, Vi3, a Massachusetts technology company, developed a groundbreaking, proprietary system to help companies like Nike combat counterfeiting. Vi3 is the brainchild of Curtis Howes, a former Marine who became an expert in serialization and marking techniques. Mr. Howes honed his expertise while working with the United States Department of Defense to mark weapons and other high-value items. In conjunction with the Department of Defense work, he worked with NASA to develop techniques for marking and tracking advanced materials, such as tiles for NASA's space shuttles. Following his work for the government, Mr. Howes formed Vi3 to explore how to continue to apply his expertise in the private sector. After early work focused on other applications of

Vi3's technology, in approximately 2008, Vi3 shifted its focus to the consumer goods industry.

4.      Through years of research and development, Vi3 invented a system for using two-dimensional "data matrix" barcodes (right, top), and later QR codes (right, bottom), to track sneakers, apparel, athletic equipment, watches, and other similar goods. Among other applications, Vi3's system allows companies to track their inventory, prevent counterfeiting, combat so-called "gray markets," where authentic products are improperly diverted from one market to another, and encourage consumer engagement.



5.      One great advantage of Vi3's system is that anyone with a smartphone can scan one of Vi3's barcodes, whether it is a "data matrix" barcode or a QR code. The two types of codes generally function the same way, except data matrix barcodes sometimes require free, widely available software to scan, whereas most smartphones can scan QR codes without any special software.

6.      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Vi3 also uses the data in its systems to help manufacturers improve supply chain efficiency, sustainability, transparency, and consumer engagement. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7.      Vi3's system encompasses many valuable trade secrets, which Vi3 has carefully safeguarded over the years with nondisclosure agreements, encryption, and other measures.

8.      Many of the world's top brands, including ███████████████ ███████████████, have chosen to license Vi3's technology. ███████ implemented Vi3's system in 2013, and the system has since allowed ███████ to seize millions of dollars' worth of counterfeit products every year.

9.      Nike chose a different path. Rather than paying Vi3 to use its system, Nike engaged in a years-long effort to steal Vi3's trade secrets. Under the guise of evaluating Vi3's system to determine whether to license it, Nike executives spent years extracting details from Vi3 about how the system worked. Nike personnel had dozens of in-person meetings and phone calls with Vi3, posed detailed questions (and received detailed answers) in writing, and even had Vi3 set up a working pilot of part of the system in a Nike lab. Through these interactions, Nike learned Vi3's valuable trade secrets. And despite repeated assurances that a deal to implement Vi3's system was just around the corner, Nike never paid Vi3 anything for the system. Instead, Nike used Vi3's trade secrets to create its own version of Vi3's system, which it has rolled out in the marketplace and continues to use today.

10.      Nike concealed its espionage efforts through a series of carefully crafted messages designed to encourage Vi3 to continue engaging with Nike. Among them, Nike informed Vi3 that it had been "officially" selected as Nike's chosen anticounterfeiting vendor, and that Nike was eager to roll out Vi3's system across

the whole company as soon as possible. Taking Nike's statements at face value, Vi3 continued to invest in winning Nike's business, and continued to answer Nike's torrent of questions about Vi3's system. Ultimately, the questions stopped coming from Nike, and Vi3 assumed it had lost the Nike business.

11.    In November 2018, Vi3 learned the real reason Nike had stopped calling. That month, Vi3 hired Paul Foley, Nike's former Director of Brand Protection and Intelligence. After he began work at Vi3, Mr. Foley informed Vi3's management that Nike never implemented Vi3's system because Nike decided it could deploy its own system by copying what it had learned from Vi3.

12.    Vi3's subsequent investigations of Nike's anticounterfeiting efforts have corroborated Mr. Foley's account. While the bulk of Nike's anticounterfeiting system is hidden from public view, in 2021, Vi3 employees learned that Nike had begun placing QR codes on its products. Nike's barcodes appear to function just like Vi3's barcodes. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████    After spotting QR codes on Nike products in 2021, Vi3 learned through further investigation that Nike began using QR codes on its products as early as 2019, shortly after Nike ceased discussions with Vi3.

13.    Also in 2021, Nike began a partnership with United States Customs and Border Patrol ("CBP"). On information and belief, the partnership is based on

Nike's "donation" of its anticounterfeiting technology to CBP. During their discussions about Nike's potential use of Vi3's technology, Vi3 and Nike had discussed the possibility of using the technology to intercept counterfeit products at the border.

14.     Nike's willful misappropriation of Vi3's technology has caused Vi3 substantial damages in the form of, among other things, lost profit. Nike's misappropriation has also unjustly enriched Nike. Vi3 accordingly brings this action for damages and injunctive relief to put a halt to Nike's unlawful use of Vi3's technology.

## Parties

15.     Plaintiff VALMARC Corporation is a Delaware corporation with a principal place of business in Needham Heights, Massachusetts. Valmarc, which does business as Vi3, is a leading data-intelligence company that provides a suite of brand protection and other products to the world's most-recognizable brands. Vi3's products provide real-time data for tracking individual products, no matter where they are in the world. Vi3's suite of tools also provides supply chain visibility, anticounterfeiting, marketplace management, and tools for consumer engagement that accompany a product throughout its life cycle, from the moment of manufacture to the hands of the consumer.

16.     Defendant Nike, Inc. is an Oregon corporation with a principal place of business in Beaverton, Oregon. Nike is the world's largest seller of athletic shoes, and one of the world's largest sellers of athletic apparel and equipment.

## Jurisdiction and Venue

17.     Vi3 brings this action under Section 2 of the Defend Trade Secrets Act of 2016, codified at 18 U.S.C. § 1836. This Court has subject-matter jurisdiction over Vi3's federal law claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c).

18.     The Court has subject-matter jurisdiction over Vi3's state law claims under 28 U.S.C. § 1367(a), because Vi3's state law claims are so related to its federal claims that they form part of the same case or controversy.

19.     The Court also has jurisdiction under 28 U.S.C. § 1332, because Plaintiff Vi3's principal place of business is in Massachusetts, Defendant Nike's principal place of business is in Oregon, and the amount in controversy exceeds $75,000.

20.     The Court has personal jurisdiction over Nike because Nike's principal place of business is in Oregon. Additionally, the Court has personal jurisdiction over Nike because Nike has purposefully established significant contacts with Oregon, and Vi3's cause of action is related to Nike's contacts with Oregon.

21.     Venue is proper in this district because Nike, a Defendant, resides in the district, and because a substantial part of the events giving rise to Vi3's claims took place in Oregon. *See* 28 U.S.C. § 1391(b).

22.     Divisional venue is proper in the Portland Division because a substantial part of the events giving rise to Vi3's claims took place in Washington County. *See* L.R. 3-2.

## Facts

**A.    Vi3 Develops its Groundbreaking Anticounterfeiting System.**

23.    In 2006, Vi3 founder Curtis Howes, along with Pat Costa, Ernie Henrichon, and later Eric Johanson, began work developing a system for using unique identifiers to detect and prevent counterfeiting of consumer goods. Vi3's research built on Mr. Howes' serialization, marking, and tracking experience, which he developed while working with the Department of Defense and with NASA on tracking and tracing systems for use on weapons, high-value items, and space technology.

24.    Translating Mr. Howes' expertise into a viable commercial product took significant work, with several false starts along the way. At first, Mr. Howes and Vi3 focused on a program for training disabled veterans to use marking and serialization technology. After a change in control of Congress scuttled that opportunity, Mr. Howes and Vi3 explored whether it would be possible to mark individual doses of medication to facilitate identification and to prevent counterfeiting. When those efforts proved unworkable, Vi3 turned to the consumer goods industry.

25.    Vi3 spent approximately four years building a system capable of marking and tracking consumer goods on a scale that would be useful to the world's biggest brands. By late 2009, the Vi3 team had developed a working demonstration product. Since then, Vi3 has continued to refine and perfect the system. The early

demonstration version of Vi3's anticounterfeiting system broadly resembled the system that Vi3 continues to market today.

26.     Vi3's system allows a manufacturer to mark each of its products with a unique two-dimensional barcode or a QR code at the time of manufacture, in a manner permitting anyone with a smartphone to scan the barcode. █████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

27.     In addition to helping brands combat counterfeiting, Vi3's system provides several other valuable capabilities. For example, Vi3's system allows brands to cut down on so-called gray market sales of authentic goods. Gray market sales are those where an authentic good is illegitimately diverted from its intended market of sale to another, usually to take advantage of price differences between the markets. By allowing brands to track the physical location of each of their

legitimate products, Vi3's system can identify gray market points of sale, as well as the original buyers who are diverting goods to other markets.

28.     Vi3's system also facilitates engagement between brands and their customers. Vi3 can customize what happens when a consumer scans a Vi3 label, allowing brands to direct the consumer to a website of the brand's choosing. Among other applications, this functionality can help brands enroll consumers in loyalty programs or collect their contact information for marketing purposes.

29.     Vi3's anticounterfeiting system embodies many proprietary trade secrets. For example, each of the following components of Vi3's system, either alone or in combination, is a protectable trade secret.

30.     First, the overall architecture of Vi3's system is a protectable trade secret. That architecture includes, among other things, ███████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

31.     Second, Vi3's physical and digital processes for creating links between different unique identifiers ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

32.     Third, Vi3's business and technical processes for generating unique identifiers and transmitting them to different parts of a consumer goods company

are protectable trade secrets. These processes include, among other things, the way Vi3 manages the flow of identifiers through various parts of a manufacturer's business, ██████████████████████████████████

████████████████████████████████████████████

██████████

33.     Fourth, Vi3's methods for generating unique identifiers that contain certain information ██████████████████████████████████ ████████████████████████████ are protectable trade secrets.

34.     Fifth, Vi3's methods for ████████████████████████ ████████████████ are protectable trade secrets. These methods include, for example, ██████████████████████████████████ ████████████████████████████████████ ████████████████████

35.     Sixth, ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████ The development of these rules required a significant amount of engineering effort, as well as trial and error to work out which business rules were most likely to identify suspected counterfeit products.

36.     Seventh, Vi3's technology and processes for reporting information about probable counterfeits and other information from its systems are protectable

trade secrets. Over time, Vi3 has developed reporting systems that quickly convey the information brands need to locate counterfeiting operations or to evaluate whether a specific article is genuine.

37.    Eighth, the wealth of knowledge Vi3 personnel have accumulated about how to successfully implement an anticounterfeiting system at a globalized consumer goods manufacturer is a protectable trade secret. Through years of work deploying the Vi3 system with different brands, Vi3 personnel have learned dozens of techniques and processes that together greatly enhance the effectiveness of Vi3's systems.

38.    The Vi3 trade secrets embodied in its anticounterfeiting system, including those described above, have substantial economic value. Many leading consumer brands have licensed Vi3's technology and purchased related services from Vi3 to allow them to combat counterfeiting and to increase engagement with their customers.

39.    Recognizing the value of its trade secrets, as well as the need to maintain the secrecy of the Vi3 system for it to be effective against counterfeiters, Vi3 takes extensive measures to safeguard the confidentiality of its trade secrets. Among them, Vi3 limits disclosure of its trade secrets to those with a need to know. Vi3 also requires employees, potential customers, and other third parties to enter into nondisclosure agreements before Vi3 shares any of its trade secrets or other confidential information. In addition, Vi3 maintains its trade secrets and other confidential information on password-protected, multifactor-authenticated

computer systems. Vi3 also maintains access and usage logs on its electronic systems and in its physical office.

40.    Because of Vi3's trade secrets, Vi3's anticounterfeiting system is unique in the market. Vi3 is not aware of any other company that offers an effective anticounterfeiting system based on barcodes. Other companies have attempted to build anticounterfeiting systems using other technologies. But efforts such as using holograms, hidden materials, and other technologies do not allow for the same amount of data collection, analysis, and real-time tracking of Vi3's system. As a result, such efforts have largely failed in the consumer goods market. The only other firm that Vi3 knows to be using a competing barcode-based anticounterfeiting system is Nike, and Nike built its system by misappropriating Vi3's trade secrets.

**B.    Counterfeiting Poses a Significant Threat to Nike.**

41.    The sale of counterfeit goods is a significant problem in the footwear, apparel, and sporting goods industries. During its fiscal year 2019, Customs and Border Patrol seized more than $380 million worth of counterfeit apparel and footwear. Despite CBP's efforts, counterfeiting remains a widespread problem. In a 2020 report, the Department of Homeland Security explained that the problem of counterfeiting "has intensified to staggering levels," and that "[a]pparel and other types of accessories, along with footwear, top the list" of CBP seizures of counterfeit goods.

42.    Counterfeiting is an especially large problem for Nike, one of the world's largest makers of athletic shoes and clothing. In a lawsuit Nike filed this

year in federal court in New York, it alleged that "[t]he success of the Nike and Converse brands has made them a prime target for counterfeiting." In 2010, one Nike employee estimated that "there was one fake Nike item for every two authentic ones."

43.     According to Nike, the distribution of counterfeit Nike-branded goods threatens to irreparably harm Nike's business. Joe Pallett, Nike's "Director Brand Protection, Authentication and Innovation," has described Nike's trademarks as "invaluable assets." In a sworn statement, Mr. Pallett explained that the sale of counterfeit Nike products irreparably damages Nike in several ways.

44.     Among them, the unauthorized use of Nike's trademarks on counterfeit goods, including its brand name, "take[s] away Nike's ability to control the nature and quality of the Counterfeit Nike Products. Loss of quality control over goods offered for sale or sold under the Nike Trademarks and, in turn, loss of control over Nike's reputation, is neither calculable nor precisely compensable."

45.     Mr. Pallett also explained that the use of Nike's brands on counterfeit goods "weakens Nike's brand recognition and reputation. Consumers who mistakenly believe that the Counterfeit Nike Products he or she has purchased originated from Nike will come to believe that Nike offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine Nike Products, resulting in a loss or undermining of Nike's reputation and goodwill. Indeed, there is damage to Nike's reputation and goodwill even if a consumer knows that the goods he or she is

purchasing are counterfeit. Prospective consumers who see inferior Counterfeit Nike Products used by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of Nike and the Nike Trademarks. Such post-sale confusion results in damage to Nike's reputation and correlates to a loss of unquantifiable future sales."

46.     According to Mr. Pallett, counterfeit products also harm Nike by causing a "loss of exclusivity." He explained that "Nike's products are meant to be exclusive. Nike's extensive marketing efforts and innovative designs are aimed at growing and sustaining sales. The Nike Trademarks are distinctive and signify to consumers that the products originate from Nike and are manufactured to Nike's high quality standards. When counterfeiters use the Nike Trademarks to offer for sale or sell goods without Nike's authorization, the exclusivity of Nike's products, as well as Nike's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales."

47.     Additionally, Mr. Pallett stated that "Nike's goodwill and reputation are irreparably damaged when the Nike Trademarks are used in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Nike. Moreover, brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to Nike's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable."

C.    ████████    **Implements Vi3's Anticounterfeiting System.**

48.    In 2009, Vi3 executives began discussions with ████████ regarding the use of Vi3's system, which Vi3 then marketed as the "Valmarc Total Vision System," on ████████ products. After Vi3 successfully piloted its system at one of ████████ factories, ████████ and Vi3 entered into an agreement to deploy Vi3's system for all of ████████ footwear and apparel products, beginning in 2013.

49.    ████████ still uses the Vi3 system today.

50.    Early in their relationship, Vi3 and ████████ entered into a Non-Disclosure Agreement, dated January 17, 2012 (the "████████ NDA").

51.    The ████████ NDA defines "Confidential Information" broadly to include, among other things, ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████

52.    The parties agreed that ███████ would not use Vi3's Confidential Information ████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████

53.    The ████████ NDA limits how ████████████████████████ can use Vi3's information. Section 2.2 of the ████████ NDA prohibits ████████ from disclosing Vi3's Confidential Information to ████████████████████ ███████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████

54.    Paul Foley, ████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████████████

55.    Vi3 and ████████ piloted Vi3's system at a ████████ factory in Vietnam in 2012. By 2013, ████████ had decided to implement Vi3's system throughout the company and began deploying it in more than two dozen ████████ factories across the globe.

56.    ████████ implementation of Vi3's system has been extremely successful. By mid-2015, Vi3's system allowed ████████ to "seize[] millions of pairs of counterfeit ████████ all over the globe."

57.    The program was so effective that it won one of ███████████ ████████████████████ in 2015.

58.    Today, Vi3's barcodes are on hundreds of millions of ████████ products, all of which are still protected by the Vi3 system.

**D.    Nike Approaches Vi3 about Implementing Vi3's System.**

59.    ███████████ success with Vi3's system caught the attention of influential executives at █████████████████████ Nike.

60.    In 2014, Mr. Foley introduced Vi3 personnel to executives at Nike and suggested that Nike adopt Vi3's system.

61.    Further, on information and belief, executives at Nike monitored the success of Vi3's system at ████████

62.    In the spring of 2015, Mr. Howes and Vi3's then-CEO, Mr. Costa, met with Bill Berner, then Nike's Vice President and Director of Global Brand Protection.

63.    After learning about the capabilities of Vi3's system, Mr. Berner wrote to Mr. Foley that ████████████████████████ A few weeks later, Mr. Foley reported to Vi3 that ██████████████████████████ ████████████████████

64.    Internally, Nike recognized that it had a need for Vi3's system. Mr. Berner wrote to his team that █████████████████████ █████████████████████████████████████ █████████████████████████████████████

██████████████████████████████████

████████████████████

65.     In the autumn of 2015, Nike assigned Shaun Houston, its Project Director, Product Labeling, to lead the implementation of Nike's product-labeling anticounterfeiting efforts, including the implementation of the Vi3 system.

**E.    Vi3 and Nike Have Detailed Discussions about Vi3's System.**

66.     After Nike assigned Ms. Houston to the project, Vi3 and Nike began regular biweekly calls to discuss Nike's implementation of the Vi3 system.

67.     The biweekly calls included multiple Nike and Converse personnel, including: Ms. Houston; Rajiv Judge, then (and now) Nike's Director of Global Manufacturing & Purchase Commitments IT; Joseph ("Jay") Eckhardt, then Nike's Assistant General Counsel; Sarah Terry, then a Direct Procurement Analyst, Global Procurement at Nike; Scott Ford, then (and now) an "IT Professional" at Nike; and Mr. Foley. From Vi3, the calls included, among others: Mr. Howes; Mr. Costa; Diane Sarantopoulos, Vi3's Vice President and Chief Administrative Officer; Mr. Johanson, Vi3's Chief Technical Officer; and Mr. Henrichon, Vi3's Chief Innovation Officer.

68.     In addition to the biweekly calls, Vi3 personnel had many other phone calls, email exchanges, and in-person meetings with Nike.

69.     For example, on November 9, 2015, a Nike team, including Ms. Houston, Mr. Eckhart, and Mr. Judge, visited the Vi3 facilities in Salem, New Hampshire. During the full-day meeting, Vi3 and Nike discussed the technical

innerworkings of Vi3's system and planned for the rollout of the system at Nike. Mr.

Judge, in particular, asked many technical questions about Vi3's technology and ███

████████████████ all of which Vi3 answered.

70.    During these calls and meetings, and through Vi3's email exchanges

with Nike, Vi3 provided Nike with a wealth of confidential information related to

technical aspects of its system, as well as confidential information related to Vi3's

approach to implementing its system across Nike's many physical locations. This

information included, among other things, Vi3 trade secrets related to the technical

operation of its system, as well as trade secrets related to the business processes

and knowhow related to the implementation of its system. Among other materials,

at Mr. Judge's request, Vi3 sent Nike system architecture diagrams, related

technical descriptions, and extensive written answers to Mr. Judge's many technical

questions.

71.    For example, on November 19, 2015, in response to questions from Mr.

Judge, Mr. Johanson sent Mr. Judge and two other Nike employees an explanation

of ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ These techniques, ████████████████

████████████████████████████████████████████████████████████

████████████ are trade secrets and key components of Vi3's system.

72.     In December of 2015, Vi3 conducted a pilot with Nike that allowed Nike to see firsthand the technical innerworkings of parts of Vi3's system. At Mr. Judge's request, Vi3 set up a working version of part of the Vi3 system in Mr. Judge's lab at Nike. Mr. Judge and other Nike personnel asked detailed technical questions related to the system, which Vi3 employees, including Mr. Johanson, answered in full.

73.     Both Vi3 and Nike understood the confidential nature of their information exchanges, and that each party would maintain the confidentiality of the other's information.

74.     Indeed, Nike understood that confidentiality was especially important in the context of discussing Vi3's anticounterfeiting system because the effectiveness of the system depends in part on secrecy. Disclosure of information about the system could alert counterfeiters to how it works and thereby reduce its effectiveness. In fact, Nike instructed Vi3 not to make public mention of ████

████████████████████████████████████████████████████████████

████████████████████████████

75.     For its part, Nike also provided Vi3 with its own confidential information related to its information technology systems and its manufacturing activities. For example, in an October 2015 email, Nike provided a password-

protected spreadsheet containing the name, location, and capacity of each of Nike's manufacturing facilities.

76.    Nike's willingness to share this kind of information with Vi3 demonstrates that Nike understood the parties to be in a confidential relationship.

77.    Nike also understood that it was not free to use Vi3's confidential information and trade secrets for its own benefit without compensating Vi3.

78.    Nike was well-aware that Vi3 was sharing its information with Nike in the hope of establishing a business relationship, whereby Nike would license Vi3's technology and pay Vi3 for associated products and services.

79.    Nike was also aware of 

80.    Further, Nike was aware of the terms of ▮▮▮▮▮▮▮ which, among other things, did not permit Nike to use Vi3's technology.

**F.    Nike Launches an RFP and Officially Selects Vi3 to Supply Anticounterfeiting Technology.**

81.    On January 26, 2016, Nike announced that it was creating "an integrated BP [brand protection] Intelligence & Operations team" with global responsibility for Nike brand protection intelligence. Among other responsibilities, the team was to ███████████████████████████████████████████████ ███████████████████████████████████████ Nike also announced that Mr. Foley would lead the team as Nike's Director of BP Intelligence and Operations.

82.    On March 25, 2016, Nike issued a request for proposal for a "Global Unit Level Product ID Solution" (the "RFP"). The RFP announced that ████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████

83.    Confirming the confidential nature of the exchanges between Nike and Vi3, the Nike RFP also stated that: ██████████████████████████████████ ███████████████████████████

84.     Vi3 submitted a response to the RFP on April 6, 2016. Vi3's response included a lengthy description of Vi3's system, as well as pricing and other proposed commercial terms for implementing the system for Nike footwear.

85.     After Nike received the proposal, Chase Sanderson, who was the designated point of contact for the RFP, asked for additional information from Vi3 regarding the scanners and other factory-based equipment Vi3 uses for its system. Mr. Sanderson also asked for pricing for an enterprise-wide license agreement, which would cover ███████████████████████████

86.     In addition to submitting a written proposal, Vi3 representatives including Mr. Howes, Mr. Costa, and Mr. Johanson traveled to Oregon on April 8, 2016 to present Vi3's system to Nike executives. The following Nike employees attended the presentation: Mr. Berner; Kevin Carsh (Footwear Operations); Mr. Eckhardt; Mr. Foley; Michal Han (a Nike IP lawyer); Ms. Houston; Mr. Judge; Mr. Sanderson; and Ms. Terry.

87.     Vi3's submission marked the beginning of approximately two years of further negotiation with Nike, including additional discussions of technical aspects of Vi3's system.

88.     For example, on June 21, 2016, Mr. Judge, Mr. Foley, and Mr. Ford asked further technical questions about Vi3's system focused on how the system could work if Nike took on certain functions for itself, such as printing labels.

89.     Throughout the negotiations, Nike repeatedly expressed its intent to implement Vi3's system.

90.     On June 15, 2016, Nike informed Vi3 that it had been "OFFICIALLY down-selected to final contract negotiations."

91.     On November 21, 2016, Nike's Barbara Delli Carpini, who had by then replaced Mr. Berner as head of Nike of Brand Protection, and Mr. Foley told Vi3 that it had been officially selected to implement the Vi3 system for Nike Footwear.

92.     Discussions between the parties continued throughout 2017.

93.     In February and March, Mr. Foley briefed various Nike senior executives on Vi3's technology, including Hillary Krane, Nike's Executive Vice President, Chief Administration Officer, and General Counsel.

94.     In a February 2, 2017 presentation he gave to Ms. Krane, Mr. Foley reported the following about Vi3's technology: ████████████████████
████████████████████████████████████
███████████████████████████████████
██████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
██████████████████

95.     In the same presentation, Mr. Foley also observed that ███████
████████████████████████████████████

[REDACTED]

[REDACTED]

96.    Mr. Foley's presentation also detailed [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

97.    In April, Mr. Foley met with Nike's Chief Financial Officer, Andy Campion, regarding the Vi3 technology.

98.    In November, Vi3 personnel traveled to Beaverton for an in-person meeting with Mr. Foley, Mark Johnson of Nike Procurement, and other "Nike Tech and source tagging implementation stakeholders."

99.    During the protracted negotiations between Nike and Vi3, Nike prohibited Vi3 from offering its services to any of Nike's major competitors, including Under Armour, adidas, and New Balance.

100.    In addition to foregoing other business opportunities, Vi3 invested in building out its staff, and even expanded its office and engineering space, to be prepared to implement its product at Nike.

101.    Despite Nike's repeated statements that it intended to implement Vi3's system, Nike and Vi3 never finalized an agreement, and Nike never licensed the Vi3 system for use on its products. Nike never informed Vi3 that it had decided not

to implement the system. Instead, Nike simply stopped contacting Vi3 about implementing its system.

102.    Nike's efforts to misappropriate Vi3's trade secrets for its own use continued for years, even after discussions between Vi3 and Nike had stopped. In February of 2019, Nike asked Vi3 to add Alexis Effler to the list of authorized users of the Vi3 systems associated with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ including the Vi3 Brand Protection Platform. At the time, Ms. Effler was a member of the Nike Connected Products team. Ms. Effler is now Nike's Director of Data Strategy. On information and belief, Ms. Effler and others at Nike exploited the access they had through ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to obtain Vi3's trade secrets and other information, which Nike used to build its own anticounterfeiting system. For example, as shown in the image below, it is possible for users of Vi3's



system to discern Vi3's "business rules," ███████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████   Thus, by reviewing ███████████████████   Vi3

identified as suspect, Nike personnel could compile a list of Vi3's business rules.

103.   On information and belief, Nike's continued engagement in discussions with Vi3, including its repeated assurances that it would implement Vi3's system, were intended to extract further information from Vi3 and to preserve the option of retaining Vi3 while Nike explored the feasibility of creating its own system using the trade secrets and confidential information it learned from Vi3.

### G.   Mr. Foley Tells Vi3 that Nike Stole its Technology.

104.   In November 2018, Mr. Foley left Nike.

105.   Shortly thereafter, Vi3 hired Mr. Foley as its Executive Vice President of Global Sales and Strategy. Mr. Foley began work for Vi3 on November 19, 2018.

106.   After Mr. Foley began work at Vi3, he informed Derek Spence, then Vi3's CEO, that the reason Nike never followed through on its plan to implement Vi3's system was because Nike was copying Vi3's technology.

107.   Mr. Foley also informed Vi3 that Nike knew it was misappropriating Vi3's proprietary technology and its intellectual property.

108.   In October 2020, Mr. Foley reiterated that Nike had copied Vi3's technology.

**H.    Evidence of Nike's Misappropriation Surfaces in the Marketplace.**

109.    Vi3's investigations of Nike's products have corroborated Mr. Foley's statements that Nike is using Vi3's technology.

110.    In early 2019, videos began to surface on YouTube showing QR codes on Nike products. For example, the YouTube video located at https://www.youtube.com/watch?v=edcFoOsPM9Y, dated February 15, 2019, shows a QR code at 3:57 (on the left).

111.    Nike products for sale in retail outlets also now have QR codes on them. For example, the below photographs of a Nike footwear shoebox and shoe labels taken in July 2021 in a Boston, Massachusetts retail store, include QR codes:






112.   Nike is using similar QR codes on the tags for its apparel items, as shown in the below samples, also from Boston in July 2021:

  

113.   When scanned using a smartphone, Nike's QR codes redirect a user's browser to ⬛⬛⬛⬛⬛, qr.nike.com, which asks the user to share their location (see below left). This functionality is identical to Vi3's system.

 

114. ███████████████████████ that users see immediately after scanning Nike's QR codes, pictured above at left, closely resembles ███████████████ ████████, pictured above at right as implemented for █████████ In addition to having a very similar appearance, both █████████████████████████ websites use nearly identical wording.

115. After the user agrees to share his or her location, the next page of the website █████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ This functionality is identical to Vi3's system.

116. █████████████████████████████████████████ █████████████████████████████████████ █████████████████████████

117. Other aspects of the Nike QR codes are also identical to Vi3's system. For example, the information encoded in the serial number closely matches the information encoded in Vi3-generated identifiers, ████████████████████ ██████████████████████

118. █████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████ This approach, █████████████████████████████████ is a Vi3 trade secret shared with Nike on November 19, 2015.

119.    The QR codes on Nike's products are a public-facing element of a larger anticounterfeiting system.

120.    Nike's ▮▮▮▮▮▮▮ website indicates that it is part of an anticounterfeiting system. Specifically, it reports "Nike uses this information to help protect the Nike brand."

121.    On information and belief, apart from Nike's publicly visible use of QR codes, Nike's system uses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

122.    In addition to placing QR codes on its products, Nike launched a partnership with CBP based on anticounterfeiting technology. In May 2021, CBP issued a press release announcing "a new formal partnership" with Nike, whereby Nike is donating "proprietary technology to aid in authenticating a variety of Nike Inc. merchandise and prevent counterfeit products from entering the U.S." On information and belief, the "proprietary technology" discussed in the press release is the system Nike created by misappropriating Vi3's technology.

123.    On information and belief, Nike used Vi3's confidential trade secrets to create its own anticounterfeiting system, including, among others, the overall architecture of Vi3's system, Vi3's processes for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Vi3's processes for managing the flow of identifiers within an organization, Vi3's methods for generating identifiers, Vi3's

methods for ████████████████████████████, Vi3's business

rules, and Vi3's knowhow and business processes related to successfully

implementing an anticounterfeiting system at a large consumer-goods company.

### First Cause of Action
### Misappropriation of Trade Secrets under the Defend Trade Secrets Act

124.    Vi3 realleges and incorporates by reference the allegations contained

in paragraphs 1 through 123.

125.    Vi3's anticounterfeiting system, including the components of the

system that Vi3 marketed to Nike and ████████ as the Valmarc Total Vision

System, includes protectable trade secrets.

126.    Vi3 disclosed these trade secrets to Nike, including, but not limited to,

trade secrets related to each of the following: ███████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████     █████████████

███████████████████████████████

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

█████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████

127.    Vi3's trade secrets have significant economic value. Numerous leading consumer brands license Vi3's technology and services to protect the reputation of their products, combat counterfeiters, and engage with their consumers. The value of Vi3's trade secrets derives in part from their secrecy. Despite the increasingly grave problem of product counterfeiting, none of Vi3's competitors have been able to successfully develop an anticounterfeiting system based on barcode technology. Indeed, the only other firm that appears to have done so is Nike, a feat Nike achieved by misappropriating Vi3's technology. Further, given the nature of the counterfeiting problem, it is critical that Vi3's system remain secret; were the counterfeiters able to learn its innerworkings, they may be able to take steps to render it less effective.

128.    Vi3 carefully maintains the secrecy of its trade secrets, including by limiting their disclosure to those who have a need to know them, using nondisclosure agreements, using password-protected and multifactor authenticated systems, and by maintaining logs of individuals who have access to the trade secrets.

129.    Nike knew or had reason to know that Vi3's trade secrets were confidential and proprietary to Vi3, and that Vi3 disclosed the trade secrets to Nike

in confidence and with the expectation that Nike would not appropriate them for its own benefit without compensating Vi3.

130.    Among other reasons, Nike was bound by, or in the alternative, aware of, Vi3's nondisclosure agreement with ██████████████████████

131.    Nike knew that the ████████ NDA prevented ███████████████████ Nike from using Vi3's information except to explore a relationship with Vi3 or to perform under an agreement with Vi3, and expressly prohibited any efforts to disassemble, reverse engineer, or replicate in any way Vi3's products. Indeed, Nike's RFP ██████████████████████████████████

132.    Nike also knew or had reason to know that the circumstances under which Vi3 disclosed its trade secrets to Nike gave rise to a duty on Nike's part to maintain the secrecy of Vi3's trade secrets and to limit their use to the purpose of exploring a business relationship with Vi3.

133.    Specifically, Nike knew both from its own discussions with Vi3 and from ██████████████████ with Vi3 that Vi3 intended to license its technology to Nike, and that Nike was not at liberty to use the technology for its own purposes without Vi3's consent.

134.    Further, Nike knew or had reason to know that it was bound to maintain the secrecy of Vi3's trade secrets given the inherent need to maintain the secrecy of anticounterfeiting measures to ensure their continued effectiveness.

135.    Nike misappropriated Vi3's trade secrets by using them to create its own anticounterfeiting system.

136.    On information and belief, Nike disclosed Vi3's trade secrets to third parties without authorization for the purpose of facilitating Nike's efforts to use Vi3's trade secrets to build its own anticounterfeiting system.

137.    The Vi3 trade secrets that Nike misappropriated are related to products and services that Vi3 offers and sells in interstate commerce.

138.    Nike willfully and maliciously misappropriated Vi3's trade secrets. Nike abused Vi3's confidence and good-faith efforts to negotiate Nike's adoption of the Vi3 system, including by using its discussions with Vi3 to extract trade secrets under the pretense of needing more information to decide whether to contract with Vi3. For example, on information and belief, Mr. Judge posed detailed technical questions to Vi3, and required Vi3 to set up a pilot version of part of its system in his lab, to better understand the innerworkings of Vi3's system so that he could wrongfully copy it.

139.    Nike's willful misappropriation of Vi3's trade secrets has caused significant monetary damage to Vi3.

140.    Nike's continued unauthorized use of Vi3's trade secrets will cause irreparable harm to Vi3.

### <u>Second Cause of Action</u>
**Misappropriation of Trade Secrets under the Oregon Trade Secrets Act**
**(O.R.S. §§ 646.461 et seq.)**

141.    Vi3 realleges and incorporates by reference the allegations contained in paragraphs 1 through 140.

---

142.    Vi3's anticounterfeiting system, including the components of the system that Vi3 marketed to Nike and ██████ as the Valmarc Total Vision System, includes protectable trade secrets.

143.    Vi3 disclosed these trade secrets to Nike, including, but not limited to, trade secrets related to each of the following: ████████████████████

████████████████████████████████

████████████████████████████

██████████████████████████████████

████████████████████████████

██████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

████████████████

144.    Vi3's trade secrets have significant economic value. Numerous leading consumer brands license Vi3's technology and services to protect the reputation of their products, combat counterfeiters, and engage with their consumers. The value of Vi3's trade secrets derives in part from their secrecy. Despite the increasingly

grave problem of product counterfeiting, none of Vi3's competitors have been able to successfully develop an anticounterfeiting system based on barcode technology. Indeed, the only other firm that appears to have done so is Nike, a feat Nike achieved by misappropriating Vi3's technology. Further, given the nature of the counterfeiting problem, it is critical that Vi3's system remain secret; were the counterfeiters able to learn its innerworkings, they may be able to take steps to render it less effective.

145. Vi3 carefully maintains the secrecy of its trade secrets, including by limiting their disclosure to those who have a need to know them, using nondisclosure agreements, using password-protected and multifactor authenticated systems, and by maintaining logs of individuals who have access to the trade secrets.

146. Nike knew or had reason to know that Vi3's trade secrets were confidential and proprietary to Vi3, and that Vi3 disclosed the trade secrets to Nike in confidence and with the expectation that Nike would not appropriate them for its own benefit without compensating Vi3.

147. Among other reasons, Nike was bound by, or in the alternative, aware of, Vi3's nondisclosure agreement with ███████████████████████████

148. Nike knew that the ████████ NDA prevented ███████████████ Nike from using Vi3's information except to explore a relationship with Vi3 or to perform under an agreement with Vi3, and expressly prohibited any efforts to

disassemble, reverse engineer, or replicate in any way Vi3's products. Indeed, Nike's

RFP ███████████████████████████████████████

149.   Nike also knew or had reason to know that the circumstances under which Vi3 disclosed its trade secrets to Nike gave rise to a duty on Nike's part to maintain the secrecy of Vi3's trade secrets and to limit their use to the purpose of exploring a business relationship with Vi3.

150.   Specifically, Nike knew both from its own discussions with Vi3 and from ███████████████████████████ that Vi3 intended to license its technology to Nike, and that Nike was not at liberty to use the technology for its own purposes without Vi3's consent.

151.   Further, Nike knew or had reason to know that it was bound to maintain the secrecy of Vi3's trade secrets given the inherent need to maintain the secrecy of anticounterfeiting measures to ensure their continued effectiveness.

152.   Nike misappropriated Vi3's trade secrets by using them to create its own anticounterfeiting system.

153.   On information and belief, Nike disclosed Vi3's trade secrets to third parties without authorization for the purpose of facilitating Nike's efforts to use Vi3's trade secrets to build its own anticounterfeiting system.

154.   Nike willfully and maliciously misappropriated Vi3's trade secrets. Nike abused Vi3's confidence and good-faith efforts to negotiate Nike's adoption of the Vi3 system, including by using its discussions with Vi3 to extract trade secrets under the pretense of needing more information to decide whether to contract with

Vi3. For example, on information and belief, Mr. Judge posed detailed technical questions to Vi3, and required Vi3 to set up a pilot version of part of its system in his lab, to better understand the innerworkings of Vi3's system so that he could wrongfully copy it.

155.    Nike's willful misappropriation of Vi3's trade secrets has caused significant monetary damage to Vi3.

156.    Nike's continued unauthorized use of Vi3's trade secrets will cause irreparable harm to Vi3.

## Jury Trial Demanded

157.    Pursuant to Federal Rule of Civil Procedure 38(b), Valmarc hereby demands a trial by jury on all issues triable of right by a jury.

## Prayer for Relief

Valmarc prays for relief as follows:

A.    Entry of judgment for Valmarc on all counts;

B.    Damages, in an amount to be proven at trial, for Nike's misappropriation of Vi3's trade secrets, including damages for Valmarc's lost profits and disgorgement of all profits made by Nike as a result of its misappropriation of Valmarc's trade secrets;

C.    Exemplary damages for Nike's willful and malicious misappropriation of Valmarc's trade secrets;

D.    Permanent injunctive relief to prevent further use of Valmarc's trade secrets by Nike;

E.    Attorneys' fees, paralegal fees, accountant fees, expert witness fees, costs, and other expenses; and

F.    Such other relief as the Court deems just and proper.

November 1, 2021                    Respectfully submitted,


                                   */s/ Laura Salerno Owens*
                                   _____


                                   Laura Salerno Owens, OSB # 076230
                                   laurasalerno@markowitzherbold.com
                                   David B. Markowitz, OSB # 742046
                                   davidmarkowitz@markowitzherbold.com
                                   MARKOWITZ HERBOLD PC
                                   1455 SW Broadway, Suite 1900
                                   Portland, OR 97201
                                   (503) 295-3085

                                   Nevin M. Gewertz (*pro hac vice* pending)
                                   nevin.gewertz@bartlitbeck.com
                                   Joshua P. Ackerman (*pro hac vice* pending)
                                   joshua.ackerman@bartlitbeck.com
                                   BARTLIT BECK LLP
                                   54 W. Hubbard Street Chicago, IL 60654
                                   (312) 494-4400

                                   Michael Merriman (*pro hac vice* pending)
                                   mmerriman@hilgersgraben.com
                                   HILGERS GRABEN, PLLC
                                   655 West Broadway, Suite 900
                                   San Diego, CA 92101
                                   (619) 369-6232

                                   Jon B. Hyland (*pro hac vice* pending)
                                   jhyland@hilgersgraben.com
                                   HILGERS GRABEN, PLLC
                                   1000 N. Central Expwy.
                                   Dallas, TX 75231
                                   (972) 645-3097

                                   *Attorneys for Plaintiff VALMARC Corp.*