**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **VALMARC CORPORATION**, d/b/a Vi3, a Massachusetts corporation, | Case No. 3:21-cv-01556-IM |
| Plaintiff, | **OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **NIKE, INC.**, an Oregon corporation, and **CONVERSE, INC.**, a Delaware corporation, | |
| Defendants. | |

Adam M. Starr, Laura Salerno Owens, and David B. Markowitz, Markowitz Herbold PC, 1455 SW Broadway, Suite 1900, Portland, OR 97201. Nevin M. Gewertz, Joshua P. Ackerman, and Matthew P. Brewer, Bartlit Beck LLP, 54 W Hubbard Street, Suite 300, Chicago, IL 60654. Jon B. Hyland and Bennett Rawicki, Hilgers Graben PLLC, 7859 Walnut Hill Lane, Suite 335, Dallas, TX 75230. William M. Burgess, Hilgers Graben PLLC, 1201 Peachtree Street NE, Building 4, Suite 100, Atlanta, GA 30361. Adam Nyenhuis, Hilgers Graben PLLC, 1320 Lincoln Mall, Suite 200, Lincoln, NE 68508. Susan A. O'Brien, Hilgers Graben PLLC, 332 S Michigan Avenue, Suite 121, Chicago, IL 60604. Attorneys for Plaintiff.

B. John Casey and Elliott Williams, Stoel Rives LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Richard T. Mulloy, Stanley J. Panikowski, and Edward H. Sikorski, DLA Piper LLP (US), 4365 Executive Drive, Suite 1100, San Diego, CA 92121. Ferlillia V. Roberson and Aima Mori, DLA Piper LLP (US), 444 West Lake Street, Suite 900, Chicago, IL 60606.Ilana H. Eisenstein, Aaron James Shaddy, and Joseph Baker, DLA Piper LLP (US), 1650 Market Street, Suite 5000, Philadelphia, PA 19103. Ben C. Fabens-Lassen, DLA Piper LLP (US), 2000 Avenue of the Stars, Suite 400, Los Angeles, CA 90067. Tamar Y. Duvdevani, DLA

Piper LLP (US), 1251 Avenue of the Americas, 27th Floor, New York, NY 10020. Harry P. Rudo, DLA Piper LLP (US), 650 S Exeter Street, Suite 1100, Baltimore, MD 21202.

**IMMERGUT, District Judge.**

This matter comes before this Court on a Motion for Summary Judgment ("MSJ"), ECF 205, filed by Defendants Nike, Inc. ("Nike") and Converse, Inc. ("Converse"). This case involves a dispute over Defendants' alleged misappropriation of anti-counterfeiting technology developed by Plaintiff Valmarc Corporation, which does business as Vi3. First Amended Complaint ("Am. Compl."), ECF 95, ¶ 24. Vi3 is a data-intelligence company that provides technology to help recognizable brands combat counterfeiting. Vi3 brings the instant action under Section 2 of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, and the Oregon Trade Secrets Act, O.R.S. 646.461 et seq. *Id.* ¶¶ 185–242. Plaintiff also brings a breach of contract claim against Converse, Nike's wholly owned subsidiary, alleging it breached an NDA by disclosing Vi3's confidential information to Nike. *Id.* ¶ 243–259.

Defendants argue they are entitled to summary judgment for four reasons: (1) Vi3 failed to take reasonable measures to protect its alleged trade secrets; (2) Vi3's contract with Converse granted Converse ownership of the alleged trade secrets; (3) Vi3's trade secret misappropriation claims are barred by the statute of limitations; and (4) Vi3 has not described its alleged trade secrets with sufficient particularity. MSJ, ECF 205. Vi3 disputes each of Defendants' arguments. Response to Defendants' Motion for Summary Judgment ("Resp."), ECF 213.

Upon review of the evidence in the record and the parties' briefing and arguments, genuine issues of material fact remain as to Vi3's confidentiality measures, the ownership of the trade secrets, the timeliness of Vi3's lawsuit, and the sufficiency of Vi3's description of the trade secrets. This Court accordingly DENIES Defendants' motion for summary judgment in its entirety.

PAGE 2 – OPINION ON SUMMARY JUDGMENT

**BACKGROUND**

**A.  Nike and Converse's Counterfeiting Problem**

Nike is the most valuable sports brand in the world. ECF 214-169, Ex. 304 ¶ 3. It is also the most frequently counterfeited. ECF 214-5, Ex. 140 at 39. Counterfeiting methods are increasingly sophisticated, and the resulting products can be "visually indistinguishable from authentic product." ECF 214-6, Ex. 141 at 12. Counterfeits can replicate "███████████ ██████████████████████████████", making them "nearly impossible to detect in the field," ██████████████████████████████. *Id.* "Gray market" sales, or the sale of legitimate products by unauthorized resellers—such as sales of Nike products on Amazon and other unofficial online distributors—also ██████████████████ annually. ECF 214-5, Ex. 140 at 38. "Rampant" counterfeiting and gray market sales have also plagued Converse. ECF 214-170, Ex. 305 at 3.

To combat counterfeiting, footwear and apparel companies employ both non-technological strategies, such as customs enforcement and litigation, *see* ECF 206-13, Ex. 13 at 2, and technological systems. One example of anti-counterfeiting technology is the use of ████████████████████████████████████████ to each individual product unit. ECF 206-14, Ex. 14 at 20–25. By ██████████████████████████████, personnel can determine whether a product is authentic or counterfeit.

**B.  Vi3's Anti-Counterfeiting Technology**

Vi3 created a technological brand-protection system to help companies identify counterfeit and gray market products. Joint Statement of Agreed and Disputed Facts ("JSOF"), ECF 198 ¶ 2. Vi3's system is called the "Vi3 Brand Protection System" ("Vi3 System") or the "Total Vision System." *Id.* Vi3 describes its System as follows: ██████████████████████ ██████████████████████████████████ *Id.* ¶ 14. The types of █████████████

used in the system include . *Id.* ¶ 13. The product's ████████ can be ████████████. *Id.* ¶ 15. ████████████████████████████████████████. *Id.* ¶ 17. The Vi3 System ████████████████████, which can be analyzed to identify probable counterfeit products or products in gray markets. *Id.* ¶¶ 18, 19. Vi3 asserts that through this process it can identify counterfeit production facilities, retailers selling counterfeit products, and gray market buyers and sellers. *Id.* ¶ 21.

Vi3 asserts that it had a working version of this system by late 2009 but continued to develop and refine it over the years. *Id.* ¶ 11.

## C. Vi3 and Converse's Anti-Counterfeiting System

Converse was Vi3's first paying customer. *Id.* ¶ 22. According to Vi3, Converse first solicited Vi3 in 2011 to provide ████████████████. *Id.* ¶ 21. From 2012 to 2017, Converse paid Vi3 approximately $12.5 million. *Id.* ¶ 32. The parties dispute how much of the version of the Vi3 System used for Converse products was created by Vi3 before Vi3 began working with Converse. *See id.* ¶¶ 11, 24–25, 95. The Vi3 System used for Converse products used ████████████ and employed ████████████████████ ████████████. *Id.* ¶¶ 97, 101.

On January 17, 2012, Vi3 and Converse entered into a non-disclosure agreement (the "Converse NDA"). *Id.* ¶ 26. Over the course of their relationship, Vi3 and Converse also entered into two Master Services and License Agreements, one effective June 1, 2015, and another effective December 9, 2020 (the "MSLAs"). *Id.* ¶ 31. The MSLAs were extended multiple times, including in April 2021, before being terminated by Converse on November 29, 2021. *Id.* ¶¶ 31, 142. The MSLAs set forth the terms and conditions of Vi3 and Converse's licensing agreement,

notably reserving all ownership rights to the "Valmarc Total Vision System" to Vi3, but also providing that Converse would own "all Developments delivered or created" jointly by the companies. *See* ECF 206-18, Ex. 18, §§ 2.4, 11.4; ECF 206-66, Ex. 65, §§ 2.4, 11.4.

**D. Vi3 and Nike's Business Relationship**

    **1. Negotiations**

In June 2015, then-Converse employee Paul Foley emailed Vi3, proposing to put Vi3's ███████████ on all Nike footwear within the next six to nine months. JSOF, ECF 198 ¶ 107. In October 2015, Nike sent Vi3 a procurement request seeking information about Vi3's business, services, and cost proposal for the potential relationship between Nike and Vi3. *Id.* ¶ 110. Nike's procurement request stated that the contents of Vi3's submission would "be treated as confidential." *Id.*

In March 2016, Nike sent a request for proposal ("RFP") to Vi3 and other potential vendors to help Nike build a ████████████████████ system to combat counterfeiting and gray market products. *Id.* ¶¶ 109, 111. The RFP stated that all bids would be confidential and that Vi3 had previously signed a copy of Nike's non-disclosure agreement ("NDA"). *Id.* ¶ 112. Vi3 submitted its bid in April 2016, which included a statement that the information it contained was confidential and contained privileged information. *Id.* ¶ 114. In June 2016, Nike wrote to Vi3 stating it had been officially selected to engage in final contract negotiations, in which the companies would discuss contract terms and pricing to enable Nike to "make an actual final decision." *Id.* ¶ 118.

Vi3 alleges that in September 2016, Vi3 and Nike were negotiating prices to develop and implement Vi3's System. *Id.* ¶ 122. In October 2016, Nike put an indefinite hold on implementing a ████ system. *Id.* ¶ 121. The parties dispute whether Nike ever informed Vi3 of

this. *Id.* Vi3 further alleges that it prepared an internal draft by April 2017, anticipating that a final contract with Nike would be executed on June 1, 2017. *Id.* ¶ 123.

Nike and Vi3 never executed a written contract for Vi3 to provide anti-counterfeiting services to Nike. *Id.* ¶ 191. Nike and Vi3 also never executed a written NDA, *id.* ¶ 190, despite negotiations to do so, *id.* ¶¶ 184–188.

In February 2018, Nike technology employee Rajiv Judge sent an internal email suggesting Nike give additional consideration to building its own product authentication system before moving forward with Vi3. *Id.* ¶ 125. Attached to the email was a document containing "red Xs" in places where Judge wanted to take what Vi3 was doing and proposed that it be done differently where "green check marks" were shown in the document. *Id.* By March 7, 2018, Nike's technology team had recommended that Nike build its own system rather than using a system from Vi3 or another vendor. *Id.* ¶ 126.

### 2. Nike's Connected Product System

Nike executives approved funding for its own anti-counterfeiting system, called Connected Product ("CP"), on April 30, 2018. *Id.* ¶ 129. ███████████████████████
████████ *Id.* ¶¶ 129, 166g, 173, 176. The parties dispute whether Vi3's System also uses these technologies, among others. *Id.* ¶ 13. ██████████████████████████████
████████████████████ *Id.* ¶ 137.

Vi3 claims neither Defendant ever told it that Nike was not going to use Vi3's System. *Id.* ¶¶ 132, 138, 144. It also alleges that Converse employees provided Nike employees with information about Vi3's system used for Converse products, *id.* ¶ 155, and that Converse did not instruct or train employees who moved from Converse to Nike that information about Vi3's System should not be used in developing CP. *Id.* ¶¶ 155, 158.

## E. Subsequent Dealings

Vi3 alleges that Nike continued to hold out the prospect of licensing Vi3's technology after it had developed and implemented the CP system. In May 2018, Converse's John Fenlon asked Vi3 executives to "continue to cooperate" with Foley and others on the team while Nike works on its "connected products strategy." *Id.* ¶ 233. On August 1, 2019, Nike and Vi3 executives exchanged emails discussing a "Vi3 / Nike Licensee Model." *Id.* ¶ 138.

On November 29, 2021, Converse notified Vi3 that it was terminating the Converse MSLA, effectively immediately. *Id.* ¶ 142. ██████████████████████████████ ██████████████████████████████ *Id.* ¶ 143.

## F. Vi3's Lawsuit

The parties dispute when Vi3 discovered that Nike was allegedly misusing its trade secrets. Vi3 alleges that it made this discovery in November 2018 when Foley, Nike's former Director of Brand Protection and Intelligence, left Nike, joined Vi3, and allegedly told Vi3 executives that Nike had copied Vi3's System. *See* Am. Compl., ECF 95, ¶ 18; Deposition of Derek R. Spence ("Spence Dep.") ECF 214-74, Ex. 209, 244:20–245:20. According to Nike, Vi3 became suspicious of Nike's use of Vi3's technology and contemplated suing as early as 2016, and in any event no later than January 2018. *See* JSOF, ECF 95 ¶¶ 195–96, 199–202, 219–22, 230–31.

Vi3 filed this lawsuit against Nike for trade secret misappropriation in October 2021. Complaint ("Compl."), ECF 3. Vi3 filed an amended complaint in March 2023, adding claims against Converse for trade secret misappropriation and breach of contract. Am. Compl., ECF 95. Vi3's complaint alleges that Nike, with Converse's help, misappropriated Vi3's anti-counterfeiting System, including its ████████████ technology. *Id.* ¶¶ 14, 17, 35, 38. Specifically, Vi3 alleges Defendants misappropriated at least eight trade secrets: (1) the "overall

PAGE 7 – OPINION ON SUMMARY JUDGMENT

architecture of Vi3's System," including the ███████████ ███████████████████████ ███████; (2) the physical and digital processes ███████████████████████████ ████████████████████████████████████; (3) the business and technical processes for generating ███████████ and transmitting them through various departments of a manufacturer's business; (4) the methods for generating ███████████ that are difficult to reverse-engineer by counterfeiters; (5) the methods for aggregating ███████████ ███████████████████; (6) Vi3's "business rules" and algorithms for identifying counterfeit products; (7) technology and business processes for reporting the data generated by its System; and (8) methodologies and knowhow for integrating the Vi3 System at a globalized consumer products manufacturer. Am. Compl., ECF 95 ¶¶ 42–49, 187; ECF 206-39, Ex. 38A.

Vi3 also alleges that Converse breached various sections of the MSLAs by disclosing Vi3's trade secrets to Nike to help Nike develop its in-house anti-counterfeiting system. Am. Compl., ECF 95 ¶¶ 243–259. Vi3 seeks damages, permanent injunctive relief preventing Defendants' further use of Vi3's trade secrets, and attorneys' fees. *Id.* at 61–62.

## STANDARDS

A party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009).

The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). The moving party bears the initial burden of identifying portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim. *Celotex Corp.*, 477 U.S. at 323. If the moving party meets this burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion. *Anderson*, 477 U.S. at 250. "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

## DISCUSSION

Defendants have not met their burden of identifying for this Court evidence that demonstrates a lack of genuine issue of material fact as to the timeliness of Vi3's trade secret misappropriation claims, Vi3's confidentiality measures, Vi3's ownership of the alleged trade secrets, or the sufficiency of Vi3's description of the alleged trade secrets and Defendants' non-use of them. While conceivable that Defendants may prevail on these claims at trial, finding for them would require this Court to construe the facts against the nonmoving party, which it cannot do at summary judgment. Further, Defendants attach over 130 exhibits to their motion, and Vi3 attaches 180 exhibits to its response. The parties' Joint Statement of Agreed and Disputed Facts is nearly 70 pages long and most facts are disputed. It is plain to this Court that genuine disputes of material fact remain, and this case is therefore not suitable for summary judgment.

## A.  Statute of Limitations

Defendants seek summary judgment on their affirmative defense that Vi3's trade secret misappropriation claims are barred by the statute of limitations. MSJ, ECF 205 at 36. Because the timeliness of Vi3's trade secret claims is dispositive, this Court begins there. A defendant

moving for summary judgment on an affirmative defense must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

Under the DTSA and OTSA, the statute of limitations is "3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d); *see* O.R.S. 646.471 (using materially identical language). The DTSA additionally specifies that a claim based on a continuing misappropriation accrues at the first alleged misappropriation. 18 U.S.C. § 1836(d). A misappropriation occurs when another party wrongfully uses, acquires, or discloses a trade secret. *See* 18 U.S.C. § 1839(5); O.R.S. 646.461(2).

The DTSA and OTSA apply the discovery rule to determine when the limitations period begins to run. *See* 18 U.S.C. § 1836(d); O.R.S. 646.471. A party's "mere suspicions and fears" of misappropriation are insufficient to show that the party had constructive or inquiry notice of the misappropriation, but "neither conclusive proof of wrongful conduct nor a smoking gun is required to commence the limitations period." *PTP OneClick, LLC v. Avalara, Inc.*, No. C19-0640, 2020 WL 4729174, at *6 (W.D. Wash. May 27, 2020) Rather, the question is whether the plaintiff knew or should have known "facts that would make a reasonable person aware of a substantial possibility that each of the elements of a claim exists." *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or. 270, 278 (2011).

"[T]he key consideration under the discovery rule is the factual, not the legal, basis for the cause of action." *PTP OneClick*, 2020 WL 4729174, at *5 (citation omitted). If disclosure of the trade secrets was authorized pursuant to a confidentiality agreement, the limitations period begins with the breach of the agreement. *See Alta Devices, Inc. v. LG Elecs., Inc.*, No. 18-CV-

00404, 2019 WL 1924992, at *13–14 (N.D. Cal. Apr. 30, 2019). When the plaintiff knew or should have known about particular facts is generally a question for the jury, unless "the uncontradicted facts established through discovery are susceptible of only one legitimate inference." *Wang v. Palo Alto Networks, Inc.*, No. C 121-05579, 2014 WL 1410346, at *5 (N.D. Cal. Apr. 11, 2014).

The parties dispute when Vi3 discovered, or should have discovered, Defendants' alleged misappropriation. Vi3 initiated this action on October 26, 2021. Motion for Leave to File Complaint Under Seal, ECF 1. Defendants argue that Vi3 had actual or constructive notice of its potential claims before October 26, 2018, thus barring its trade secrets claims. MSJ, ECF 205 at 37. Defendants claim the record establishes that Vi3 believed Nike had "improperly obtained" its alleged trade secrets potentially as early as 2015 or 2016, such that no reasonable jury could find Vi3's claims were timely. *Id.* For its part, Vi3 argues it was not on notice of the alleged misappropriation until November 2018. Resp., ECF 213 at 39. It characterizes the earlier events that Nike cites as demonstrating mere speculation or suspicion of misappropriation, not the notice required to commence the running of the limitations period. *Id.* It also argues in the alternative that Nike's ongoing communications with Vi3 suggesting it might license Vi3's technology should equitably bar Defendants' statute of limitations defense. *Id.*

Defendants fail to meet their burden of establishing as a matter of law that Vi3 knew or should have known about its potential trade secrets claims before November 2018, when Foley told Vi3 that Nike was using its trade secret information. While Defendants marshal some evidence to support their theory, this Court cannot accept Defendants' conclusion without construing the evidence against Vi3, which is inappropriate at summary judgment. *Clicks Billiards*, 251 F.3d at 1257.

### 1.  2015 and 2016 Pat Costa Emails

The earliest point at which Defendants argue Vi3 knew or should have known about its potential trade secret claims is November 2015, when Vi3 alleges in its amended complaint that Defendants' employees obtained information regarding Vi3's System "under false pretenses" to aid Nike's "development of a competing anticounterfeiting system." *See* MSJ, ECF 205 at 41 (quoting Am. Compl., ECF 95 ¶ 58). But Vi3's complaint—the only document Defendants cite to support this argument—is not evidence, and the allegations of improper trade secret acquisition therein are likely based on information Vi3 learned later, not on information that Vi3 knew or should have known in late 2015.

Defendants next argue that Vi3 had notice of its trade secret claims in December 2015 or May 2016, citing to emails from Vi3's then-CEO Pat Costa. In a December 2015 email, Costa said Vi3 was "very concerned by the recent statements and actions of Rajiv Judge of Nike IT." ECF 206-124, Ex. 123. The email explains that Vi3 staff provided "responsive and complete" answers to Judge's "many technical questions" and that Judge continued to inquire about features of Vi3's "system and technology." *Id.* The email also outlines Judge's communications with Avery Dennison ("AD"), one of Vi3's competitors for Nike's business. *Id.*

In the May 2016 email, Costa stated that, if Nike selected one of Vi3's competitors, Nike would be buying a "counterfeit system." ECF 206-35, Ex. 35 at 3. Costa went on to explain that Vi3 is the "industry leader in this technology area" and that AD and other competitors "are 'copying' us." *Id.* He also states that Judge had "improperly obtained competitive knowledge, and almost certainly shared it with the company(s) he is working with to unseat us." *Id.* at 3–4.

These emails do not show, as a matter of law, that in December 2015 or May 2016, Vi3 knew or should have known of facts sufficient to bring a trade secret misappropriation action against Defendants. This Court will not construe emails expressing Costa's general concerns

about a single Nike employee's actions as undisputed evidence that Vi3 knew or should have known facts sufficient to establish a cause of action for trade secret misappropriation in December 2015 or May 2016.

Defendants cite two cases to support their argument: *Ashton-Tate Corp. v. Ross*, 916 F.2d 516 (9th Cir. 1990), and *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212 (10th Cir. 2000). MSJ, ECF 205 at 43. Those cases do not help Defendants because, in both cases, it was undisputed that the claimant had *actual knowledge* that the other party had disclosed its trade secrets to third parties. *See Ashton-Tate Corp. v. Ross*, 728 F. Supp. 597, 603 (N.D. Cal. 1989), *aff'd*, 916 F.2d 516 (9th Cir. 1990) (finding it was "undisputed that [counterclaimant] disclosed [claimant's] alleged trade secrets to [third parties]," and thus the claimant's "right to sue for infringement accrued" then); *Chasteen*, 216 F.3d at 1217 (finding it was "undisputed that [plaintiff] had actual knowledge that [the defendant] misappropriated its trade secrets more than six years before filing the instant suit").

That is not the case here. The only evidence Defendants have produced from 2015 and 2016 are Costa's emails, which are not evidence that any third party ever actually acquired Vi3's trade secrets through Judge or anyone else at Nike, or that Vi3 knew or should have known as much. Rather, they are "concerns and suspicions rather than *knowledge* of misuse," and "therefore do not start the clock of the statute of limitations." *Sokol Crystal Prod., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994) (emphasis in original).

Even if these emails were evidence that Vi3 knew or should have known of its trade secret claim, Vi3 has raised rebuttal evidence that creates a genuine dispute of fact. In a

deposition,[1] when Vi3 President Curtis Howes was asked whether Costa was concerned that Judge was sharing Vi3 information with competitors like AD, Howes responded: "My opinion is that he didn't know that to be the case but he wanted to bring it to light that they need to be aware of it[,] that it could potentially happen." Deposition of Curtis Howes ("Howes Dep."), ECF 214-83, Ex. 218 at 16. In response, defense counsel restated in question form: "He had some *suspicions* based on conversations that Mr. Judge had indicated he had with Avery Dennison; is that right?" *Id.* (emphasis added). Howes responded, "there is a potential for that, yes." *Id.* Howes went on to explain that Costa's concern was that Judge was "really a proponent of Avery Dennison" because Judge told another Vi3 executive "that Avery Dennison had a better system than us." *Id.* at 17. Further, several Vi3 employees testified in deposition that Costa was constantly worried about protecting Vi3's intellectual property, so much so that some employees jokingly referred to him as "paranoid Pat." *See*, *e.g.*, Deposition of David Owen ("Owen Dep."), ECF 214-81, Ex. 216 at 4–5; Deposition of Diane Sarantopoulos ("Sarantopoulos Dep."), ECF 214-82, Ex. 217 at 4–6; Howes Dep., ECF 214-83, Ex. 218 at 13–14; Deposition of Paul Foley ("Foley Dep."), ECF 214-15, Ex. 150 at 24.

Defendant has not cited any evidence showing Vi3 knew in 2015 or 2016 that Judge shared Vi3's trade secrets with AD or otherwise misused them. By contrast, Vi3 has produced evidence that Costa's statements reflected general suspicion and fear of misappropriation. Based on this evidence, a reasonable jury could find that Costa's statements amounted to mere

---

[1] A trial court can only consider admissible, authenticated evidence in ruling on a motion for summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). A deposition or extract thereof is authenticated "when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Id.* at 774 (citing Fed. R. Evid. 901(b); Fed. R. Civ. P. 30(f)(1), 56(e)). All of the cited depositions meet these requirements.

suspicion and that they reflected Costa's general concern that Nike may have preferred AD's system over Vi3's, not that he knew or should have known Defendants were misappropriating Vi3's trade secrets.

### 2. Pat Costa's Other Pre-2018 Comments

Defendants cite other comments by Costa to argue that Vi3 had actual or constructive notice of the basis from its trade secret claims by at least the date of Costa's passing in January 2018. MSJ, ECF 205 at 37. Defendants argue that Costa "openly discussed suing Nike" based on his belief that Nike had copied Vi3's system. *Id.* at 37–38. Defendants rely on deposition testimony from Vi3 senior engineer Eric Johanson, who recalled periodic conversations with Costa about Nike allegedly copying its system. Deposition of Eric Johanson ("Johanson Dep."), ECF 206-36, Ex. 36 at 4, 7–8. They also point to the deposition testimony of former Vi3 employee Brian Anderton, who stated he was unsurprised to learn of this lawsuit because "[t]here had been discussion while [he] was an employee at Valmarc or Vi3 that there potentially could be something that happened." Deposition of Brian Anderton ("Anderton Dep."), ECF 206-37, Ex. 37 at 4–8.

As Vi3 points out, the timeline in Johanson's deposition is inconsistent with the factual record and suggests he was confused about the timeline of events. Resp., ECF 213 at 41–42. Johanson testified that Costa, "upon learning from Paul Foley's statement 'Nike copied your system' . . . would have been doing whatever he could to try to figure out what does that mean." Johanson Dep., ECF 206-36, Ex. 36 at 4. He also described several "by-the-water-fountain conversations" with Costa in "the late 2018 timeframe, when . . . Paul dropped the bombshell." *Id.* at 7. But Foley's alleged statements to Vi3 were made in November 2018,[2] months after

---

[2] *See* Deposition of Derek Spence ("Spence Dep."), ECF 214-74, Ex. 209 at 7–8 (testifying that Foley told Vi3 that Nike "developed their own system based on the knowledge

Costa died in January 2018. JSOF, ECF 198 ¶ 218. Further, Derek Spence and Curtis Howes both testified that they were the first two people who spoke with Foley about Nike allegedly copying Vi3's system. Spence Dep., ECF 214-74, Ex. 209 at 6–7; Howes Dep., ECF 214-83, Ex. 218 at 24–25; Declaration of Derek Spence ("Spence Decl"), ECF 214-176, Ex. 311 ¶ 3; Declaration of Curtis Howes ("Howes Decl."), ECF 214-178, Ex. 313 ¶ 6.

Anderton's statements, meanwhile, are too vague to show Vi3's executives knew about the alleged misappropriation before November 2018. Anderton testified that conversations about potentially suing Nike occurred before he left the company in June 2021, but he could not recall "how far back the conversations were." Anderton Dep., ECF 206-37, Ex. 37 at 5–6 (Q: "Do you recall if they happened before 2021?" A: "I honestly don't recall."). He testified that he did not speak with any Vi3 lawyers about potential lawsuits, *id.* at 6, and that the discussions he did recall were "not detailed" and "could be something that could be pending eventually." *Id.* at 7. He mentioned that some Vi3 executives were concerned "that there was information that [Nike] *may* have that they could use to reverse-engineer our system." *Id.* at 9. (emphasis added). At no point, however, did Anderton offer concrete testimony suggesting Vi3 executives had learned of facts sufficient to support a misappropriation claim.

Johanson's deposition testimony cannot be reconciled with the timeline that appears in the agreed facts submitted to this Court, and Anderton's describes only general discussions without specifying a time. Neither is sufficient to undisputably show that Costa ever knew Nike was misappropriating Vi3's trade secrets.

---

that they got from your system"); Howes Dep., ECF 214-83, Ex. 218 at 24–25 (testifying Foley said "Nike has copied your system"); *see also* Foley Dep., ECF 214-15, Ex. 150 at 4 (testifying he joined Vi3 in November 2018).

### 3. 2018 Emails

Defendants next argue that emails between Vi3 executives about suing Nike show that Vi3 had notice of its potential trade secret claims in April 2018. On April 27, 2018, Vi3 co-founder Diane Sarantopoulos circulated a news article to other Vi3 executives about a lawsuit filed against Nike by an IT company that alleged Nike had misappropriated its software. ECF 206-111, Ex. 110 at 1–3. In response, Vi3's then-CEO Derek Spence responded: "let's find out which law firm [the IT company] is using, as they may like the opportunity to 'Just Do It' again sometime soon!" *Id.* at 1.

This email exchange is not definitive evidence that Vi3 knew about Defendants' potential trade secret misappropriation. Though Spence testified in his deposition that his comment meant Vi3 might also attempt to sue Nike, *see* Spence Dep., ECF 206-112, Ex. 111 at 4–5, both Spence and Vi3 executive John O'Brien testified that the "Just Do It!" comment was a joke. Spence Dep., ECF 218-31, Ex. 31 at 4, 6,[3] (describing the comment as "pithy" and "a funny little remark"); Deposition of John O'Brien ("O'Brien Dep."), ECF 206-50, Ex. 49 at 50 (testifying Spence was "being a smart ass"). Vi3 never actually contacted the IT company's law firm. Spence Dep., ECF 206-112, Ex. 111 at 3.

In any event, even if Spence's comment betrayed a sincere intent to sue Nike, Defendants have not shown that this email exchange demonstrates an intent to sue for trade secret misappropriation. Spence testified that, at the time, Vi3 was suspicious of Nike's potential infringement on Vi3's patents, not misappropriation of its trade secrets. Spence Dep., ECF 206-

---

[3] Though this deposition is attached to a declaration Plaintiff filed in support of its response to Defendants' spoliation motion, another excerpt from the transcript of the same deposition is attached as exhibit 111 to Defendants' motion for summary judgment. Plaintiff's exhibit begins on page 272 of the transcript, whereas Defendants' exhibit begins on page 274.

112, Ex. 111 at 5 (explaining that the comment "was in reference to the concerns that . . . [Nike] may be bumping up against our patents"); Spence Decl., ECF 214-176, Ex. 311 ¶¶ 4–5 ("My statement in that email relates to concerns that Nike may attempt to infringe Vi3's patents. At the time, we did not contemplate that Nike was misappropriating Vi3's trade secrets."). Patent infringement and trade secret misappropriation are not overlapping claims, because a plaintiff "has a viable trade secret claim . . . only if he reveals implementation details and techniques *beyond* what was disclosed in his patent." *Aqua-Lung Am., Inc. v. Am. Underwater Prod., Inc.*, 709 F. Supp. 2d 773, 788 (N.D. Cal. 2010) (emphasis in original); *see, e.g.*, *Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020) (rejecting trade secrets claim where the "alleged trade secrets were completely parallel to what was disclosed in . . . published patent applications"). Even if Vi3 had contemplated a suit for patent infringement, that suit would necessarily be based on different information than the basis of their current trade secrets action.

Defendants point to other 2018 emails in which Vi3 sent "multiple intellectual property attorneys" documents, such as the Converse NDA, and "received legal advice on 'strategy' and 'patent infringement analyses.'" MSJ, ECF 205 at 40. The first exhibit Defendants cite is an April 18, 2018, email exchange between Vi3 executives and an attorney with the subject line "Valmarc patent summary," scheduling a meeting to discuss the findings of the attorney's review of Vi3's "patent portfolio." ECF 206-120, Ex. 119. The second is a privilege log listing emails between Vi3 executives and attorneys about "intellectual property matters" and "Converse NDA" between April and October 2018. ECF 206-122, Ex. 121. This Court fails to see how Vi3's decision to retain counsel to analyze intellectual property issues is undisputed evidence of Vi3's knowledge of Defendants' potential trade secret misappropriation. Neither the April 18 email exchange nor the privilege log mention trade secret misappropriation, and neither shows

that Vi3 was contemplating legal action against any particular third party. *Cf. Alamar Bioscis., Inc. v. Difco Lab'ys, Inc.*, No. CIV-S-941856, 1995 WL 912345, at *6 (E.D. Cal. Oct. 13, 1995) (concluding misappropriation claim was time-barred in part because the plaintiff "evaluated legal action against [the defendant] for misappropriation" but "decided not to investigate further"). To assume analyses described generally as "intellectual property matters" were in fact specifically investigating Defendants' potential misuse of Vi3's trade secrets would require construing the facts against Vi3, which is inappropriate on summary judgment.

### 4. Other Evidence of Vi3's Knowledge

Next, Defendants argue Vi3's "widespread concern" about Nike's decision to build its own anti-counterfeiting system in April 2018 shows Vi3 knew about a possible trade secret claim at that time. MSJ, ECF 205 at 39. But some of the evidence Defendants cite suggests that, throughout 2018, Vi3 believed that Nike would contract with Vi3 to develop elements of Vi3's System. *See, e.g.*, ECF 206-113, Ex. 112 at 2 ("[S]o Nike's trajectory seems to be to continue to invent their own system, and just use our mobile apps."); *see also* JSOF, ECF 198 ¶ 233 (agreeing that, in May 2018, Converse's John Fenlon asked Vi3 to "continue to cooperate" with Foley and others on the team). Indeed, some evidence shows that Vi3 was still trying to win Nike's business at that time. *See, e.g.*, ECF 206-116, Ex. 115 (Vi3's president and CEO agreeing in July 2018 that Vi3 should "find a way to be a part of whatever it is that Nike is trying to do").

Defendants have not produced conclusive evidence that Vi3 knew Nike used Vi3's technology to build its CP system, and a reasonable jury could find that Vi3 could not have learned about Nike's use of its trade secrets prior to November 2018, which is within three years of the filing of the Complaint. One of Defendants' experts testified that it would have been impossible for Vi3 to discover the full extent of Nike's alleged misappropriation based on the public elements of Nike's new system. Deposition of Kari Kammel ("Kammel Dep."), ECF 214-

134, Ex. 269 at 3–5. Although Vi3 "obviously was suspicious about what defendants were doing," its inability to confirm that suspicion makes summary judgment inappropriate on the statute of limitations affirmative defense. *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1258, 1266 (N.D. Cal. 1991).

### 5. Tolling

Vi3 argues that, even if the statute of limitations began to run before November 2018, "Defendants' continued communications with Vi3 about a license agreement lulled Vi3 into believing that Nike was not using Vi3's confidential information to build its own system." Resp., ECF 213 at 48. Because this Court finds there are genuine disputes of material fact as to when the statute of limitations began running, it need not address Vi3's tolling argument.

\*   \*   \*   \*

Defendants have not met their burden of demonstrating that no genuine dispute of material fact exists as to its affirmative defense of statute of limitations, such that no reasonable trier of fact could find Vi3's claim was timely. Although Defendants may prevail on this issue at trial, there are disputed facts susceptible of more than one legitimate inference, such that summary judgment on this issue is not warranted. Accordingly, the parties should draft a verdict form asking the jury to decide facts at trial necessary to determine the timeliness of Vi3's claims.

## B. Vi3's Confidentiality Measures

Defendants also seeks summary judgment on Vi3's alleged failure to take reasonable measures to keep its information secret. MSJ, ECF 205 at 10.

Both the DTSA and OTSA require a plaintiff to show "(1) the information was in fact a trade secret, (2) plaintiff took reasonable measures to maintain the secrecy of the information, and (3) defendant's conduct constitutes misappropriation." *Isosceles Holding, LLC v. All. Env't Grp., LLC*, No. 3:23-CV-01004-AN, 2023 WL 4947866, at *11 (D. Or. Aug. 3, 2023) (citing

PAGE 20 – OPINION ON SUMMARY JUDGMENT

*Univ. Acct. Serv., LLC v. Schulton*, No. 3:18-cv-01486-SI, 2019 WL 2425122, at \*5 (D. Or. June 10, 2019)).

Defendants argue that Vi3 has failed to show that it took reasonable measures to protect its trade secret information. MSJ, ECF 205 at 10. Specifically, Defendants argue that the lack of an NDA between Vi3 and Nike, as well as between Vi3 and several of its other customers, shows that Vi3 failed to take reasonable measures to protect its trade secrets. *Id.* at 11–19. Vi3 concedes that it never agreed on the specific terms of an NDA with Nike, but argues that it took sufficient reasonable measures to protect its trade secrets to create a triable issue of fact. Resp., ECF 213 at 17–18.

"Whether a company has taken reasonable efforts to protect its trade secrets is a 'quintessentially fact-specific' inquiry." *Palantir Techs. Inc. v. Abramowitz*, No. 19-cv-06879, 2022 WL 2952578, at \*4 (N.D. Cal. July 26, 2022) (collecting cases). Reasonable efforts can include "confidentiality procedures," "confidentiality agreements," and "oral and written understandings," among other measures. *United States v. Chung*, 659 F.3d 815, 825–26 (9th Cir. 2011). "Only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment." *Palantir*, 2022 WL 2952578, at \*4 (quoting *AT&T Commc'ns of Cal., Inc. v. Pac. Bell*, 238 F.3d 427, at \*2 (9th Cir. 2000)).

### 1. Implied Duty of Confidentiality

First, Vi3 has produced evidence that Nike knew of Vi3's NDA with Converse, creating an implied duty of confidentiality.

The Ninth Circuit has held that "[a]n implied duty of confidentiality is found when the other party has reason to know that the information was in fact confidential." *Carr v. AutoNation, Inc.*, 798 F. App'x 129, 130 (9th Cir. 2020); *see also VBS Distrib. Inc. v. Nutrivita Lab'ys, Inc.*, 811 F. App'x 1005, 1009 (9th Cir. 2020) ("Providing alleged trade secrets to third

parties does not undermine a trade-secret claim, so long as the information was 'provided on an understanding of confidentiality.'" (quoting *United States v. Nosal*, 844 F.3d 1024, 1043 (9th Cir. 2016)). The central question is whether an "understanding of confidentiality" existed sufficient to avoid "undermin[ing] a trade secret claim." *Nosal*, 844 F.3d at 1043. That is typically a factual question for the jury.

As this Court previously stated in its Opinion and Order denying Defendants' Motion to Dismiss, "knowledge of the Converse NDA put Nike on notice of the confidentiality of the information discussed between Nike and Vi3." ECF 66 at 8. Vi3 has identified evidence in the record showing Nike knew of the Converse NDA when it began negotiating to license technology from Vi3, and that at least some employees on both sides thought it applied to Nike. *See* ECF 214-20, Ex. 155 (email from Vi3 to Nike expressing the belief that "the executed Converse NDA . . . probably covers Nike"); ECF 214-18, Ex. 153 (email from one Nike employee to another saying "we have an NDA with Valmarc"); Deposition of Shaun Houston, ECF 214-90, Ex. 225 at 4; ECF 214-19, Ex. 154 at 5 (noting, in Nike's RFP, that "[a] copy of the NIKE Non-Disclosure Agreement (NDA) has previously been signed by your firm").

Defendants argue that voluntary disclosure of trade secrets in reliance on "an allegedly 'implied NDA' is not a reasonable means of protecting trade secrets." MSJ, ECF 205 at 13. But the only cases Defendants cite supporting this proposition are unpublished out-of-circuit district court cases, *id.*, and two Sixth Circuit cases, *BDT Products, Inc. v. Lexmark International, Inc.*, 124 F. App'x 329 (6th Cir. 2005), and *Novus Group. v. Prudential Financial, Inc.*, 74 F.4th 424, 428 (6th Cir. 2023). Reply in Support of MSJ ("Reply"), ECF 219 at 3. *BDT* involved factually dissimilar "one-way" confidentiality agreements that did not require the recipients to keep the plaintiff's information confidential. 124 F. App'x at 331, 333. The *BDT* court declined to read an

implied two-way duty of confidentiality into a written agreement that, by its express terms, protected one party's trade secrets but not the other's. *See id.* at 332–33. *Novus Group*, for its part, involved a chain of confidential relationships: one party had a confidential relationship with a second party, which had a separate confidential relationship with a third party, but the court concluded that this chain did not create an implied duty of confidentiality between the first and third parties. *See* 74 F.4th at 428. This case, which involves an NDA between one party and the other party's corporate subsidiary, involves a far closer relationship than *Novus Group*.

Defendants also point out that this Court recently dismissed a trade secret misappropriation claim where the plaintiff disclosed trade secret information to its customers. *DAT Sols., LLC v. Convoy, Inc.*, No. 3:22-CV-00088-IM, 2023 WL 3058057, at *5 (D. Or. Apr. 24, 2023). But the customers in *DAT* were under no obligation to protect the confidentiality of the information they received. *Id.* Here, by contrast, Nike was aware that Vi3 and Converse had an NDA that remained in effect throughout Nike's relationship with Vi3. *See* Opinion & Order on Defendants' Motion to Dismiss, ECF 66 at 7. Unlike in *DAT*, this was sufficient to "put Nike on notice of the confidentiality of the information discussed between Nike and Vi3." *Id.* at 8.

### 2. Vi3's Evidence of Confidentiality with Other Third Parties

Defendants next argue that Vi3 disclosed trade secret information to other third parties without an NDA. Although the parties agree that Vi3 has executed hundreds of NDAs with third parties, *see* JSOF, ECF 198 ¶ 54, Defendants allege that Vi3 disclosed its trade secrets to additional third parties with which it did not have NDAs. MSJ, ECF 205 at 14–17.

Vi3 has produced evidence that such disclosures were nonetheless understood by the parties to be confidential, citing NDA agreements with contractors or agents hired in connection with Vi3 projects. *See* Resp., ECF 213 at 24–27; *see, e.g.*, ECF 214-97, Ex. 232 (NDA between Vi3 and ██████████), ECF 214-98, Ex. 233 (NDA between Vi3 and ████████████

PAGE 23 – OPINION ON SUMMARY JUDGMENT



); ECF 214-99, Ex. 234 (NDA between Vi3 and ▮▮▮▮▮

▮▮▮▮); ECF 214-102, Ex. 237 (NDA between Vi3 and ▮▮); ECF 214-103, Ex. 238 (NDA

between Vi3 and ▮▮▮▮▮, agent of ▮▮); ECF 214-106, Ex. 240 (NDA between Vi3 and

▮▮▮▮▮). Vi3 also points to email communications evidencing an intent to keep

confidential the information it shared with third parties, even in the absence of an NDA. *See,*

*e.g.*, ECF 206-59, Ex. 58 (email with ▮▮▮▮▮); ECF 214-106, Ex. 241 (email with ▮▮

▮▮); ECF 214-96, Ex. 231 (email with ▮▮▮▮▮).

It would be inappropriate for this Court to grant summary judgment for Defendants on

this issue simply because Vi3 did not sign NDAs with every potential customer. Courts have

denied summary judgment based on far less evidence. *See, e.g., VBS Distrib.*, 811 F. App'x at

1008–09 (reversing summary judgment where plaintiff had no written agreements, but "orally

review[ed]" confidentiality obligations with vendors); *Bal Seal Eng'g, Inc. v. Nelson Prods.*,

No. 13-cv-01880, 2018 WL 4697255, at *5 (C.D. Cal. Aug. 3, 2018) (denying summary

judgment despite disclosure of trade secrets to customers without NDA because plaintiff took

"other precautions to keep its information secret," such as verbal confidentiality precautions).

### 3. Vi3's Evidence of Other Reasonable Measures

Finally, Vi3 has produced evidence of other reasonable measures it took to protect its

trade secrets. "[D]isclosure to a third-party without a confidentiality agreement does not

necessarily foreclose a finding that a plaintiff has taken reasonable measures to maintain the

secrecy of the alleged trade secret." *Vesta Corp. v. Amdocs Mgmt., Ltd*, No. 3:14-CV-01142-HZ,

2018 WL 4354301, at *16 (D. Or. Sept. 12, 2018); *see also Hilderman v. Enea TekSci, Inc.*, 551

F. Supp. 2d 1183, 1201 (S.D. Cal. 2008) (holding that a "lack of confidentiality agreements is

not dispositive on the issue of secrecy" because a company "may have taken other precautions to

keep its information secret"). Such evidence includes (1) deposition testimony as to Vi3's culture

of confidentiality;[4] (2) Vi3's requirement that every incoming employee sign a confidentiality

agreement, *see* O'Brien Dep., ECF 214-84, Ex. 219 at 3–4; Valmarc Confidentiality Agreement,

ECF 214-78, Ex. 213; (3) Vi3's written Code of Ethics prohibiting disclosure of confidential

information, *see* ECF 214-85, Ex. 220 at 7; and (4) confidentiality reminders in weekly company

meetings, *see* Howes Dep., ECF 214-83, Ex. 218 at 4–5; Johanson Dep., ECF 214-79, Ex. 214 at

25–26. This evidence is sufficient for a jury to find that Vi3's "oral and written understandings

of confidentiality" were sufficient "reasonable measures" to keep its trade secret information

confidential. *Chung*, 659 F.3d at 825–26.

Despite the lack of an NDA between Nike and Vi3, viewing the evidence in the light

most favorable to Vi3, a reasonable jury could find that Vi3 took sufficient reasonable measures

to protect its alleged trade secrets in accordance with 18 U.S.C. § 1839(3)(A).

### 4. Public Disclosure

Defendants also argue Vi3 publicly disclosed its alleged trade secrets in a presentation at

a public anti-counterfeiting conference in 2018. MSJ, ECF 205 at 18. Defendants claim the

presentation shared the Vi3 System's process for tracking products █████████████

███████ (trade secret 3), the generation of ██████████ and ██████████ (trade secret 2),

and dashboards contained in trade secret 7. *Id.* Defendants also argue Vi3 explained its

██████████ process on a podcast in 2019. *Id.* at 19. Vi3 contends that these disclosures were "at

such a high level that they do not amount to disclosure of Vi3's trade secrets." Resp., ECF 213 at

27.

---

[4] *See* Johanson Dep., ECF 214-79, Ex. 214 at 25–26; Anderton Dep., ECF 214-80, Ex. 215 at 8–9; Owen Dep., ECF 214-81, Ex. 216 at 4–5; Sarantopoulos Dep., ECF 214-82, Ex. 217 at 4–6; Howes Dep., ECF 214-83, Ex. 218 at 13–14.

Trade secret plaintiffs are required to undertake reasonable efforts to keep their trade secrets from being generally known by the public. *See* 18 U.S.C. § 1839(3)(A)-(B); O.R.S. 646.461(4)(a)-(b). Courts in this district have found, however, that "[a]bsolute secrecy is not a prerequisite for trade secret protection; the precautions taken need only be reasonable." *Vesta Corp.*, 2018 WL 4354301, at *15 (alteration in original) (quoting *Amvac Chem. Corp. v. Termilind, Ltd.,* No. CIV 96-1580-HA, 1999 WL 1279664, at *7 (D. Or. Aug. 3, 1999)). Public disclosure of information in general terms does not necessarily preclude a finding that reasonable measures were taken to keep the trade secrets confidential. *See id.* (finding the publication of an article and paper that spoke "in general terms" about the plaintiff's trade secret information did not preclude a finding that the plaintiff took reasonable measures to maintain secrecy).

This Court agrees with Vi3 that its 2018 presentation describes its System with sufficient generality to create a triable issue of fact for a jury. While the presentation gives an overview of the Vi3 system, it does not explain how the system works, including how Vi3 tracks products or generates ███████████. *See* ECF 206-63, Ex. 62 at 11. This Court is also not prepared to decide, as a matter of law, that the images of Vi3's dashboards in the presentation encompass the exact information in trade secret 7. The static images in the presentation do not disclose how Vi3 created this data and are provided only as "examples of [the] interfaces and reports" that are trade secret information. *See* ECF 206-39, Ex. 38A at 4.

The same is true for the podcast. In the interview, Foley, at that point an employee of Vi3, described "integrat[ing] . . . purchase order data" and "███████████ it with label providers." ECF 206-64, Ex. 63 at 10. He then describes "tying three ███████████████ together" from the "██████████████████████." *Id.* at 10–11. This general description does not reveal how Vi3 generates ███████████, how ██████████████, or ██████████████████████

████████████████████, all of which are part of trade secret 2. Accordingly, a jury

could find, despite these public disclosures providing a general overview of Vi3's System, that

Vi3 made reasonable efforts to maintain the secrecy of its trade secret information.

## C. Ownership of the Alleged Trade Secrets

Defendants next argue Vi3's lawsuit fails because Converse, not Vi3, owns the alleged

trade secrets. MSJ, ECF 205 at 20. They argue that this also requires dismissal of Vi3's breach of

contract claim against Converse. *Id.* at 36.

To assert a trade secrets claim under the DTSA, a plaintiff must own the asserted trade

secrets. *See* 18 U.S.C. §§ 1836(b)(1), 1839(4). Similarly, under the Uniform Trade Secrets Act

("UTSA"), which Oregon adopted as the OTSA, *see* O.R.S. 646.475(1); *Lamb-Weston, Inc. v.

McCain Foods, Ltd.*, 941 F.2d 970, 972 n.1 (9th Cir. 1991), a plaintiff must demonstrate that it

owned the trade secret to state a prima facie claim for trade secret misappropriation. *Agency

Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1015 (E.D. Cal. 2011)

(interpreting California's UTSA).

Defendants argue that the trade secrets were jointly developed by Vi3 and Converse and

that the Master Services and License Agreements ("MSLA") between the companies assign

ownership of any jointly developed trade secrets to Converse.[5] MSJ, ECF 205 at 20. Vi3

responds by arguing that the trade secrets predate its partnership with Converse and that

Defendants have consistently acknowledged Vi3's ownership of the trade secrets at issue. Resp.,

ECF 213 at 36.

---

[5] Vi3 and Converse executed two MSLAs, which the parties refer to as the 2015 MSLA
and the 2020 MSLA. JSOF, ECF 198 ¶ 31. The 2020 MSLA is materially identical to the 2015
MSLA. *Compare* ECF 206-18, Ex. 18 (2015 MSLA), *with* ECF 206-66, Ex. 65 (2020 MSLA).
Citations in this opinion are to the 2015 MSLA.

PAGE 27 – OPINION ON SUMMARY JUDGMENT

### 1. Structure of the MSLA

The MSLA licenses to Converse "certain licenses, hardware, and services" that are a part of Vi3's System. ECF 206-18, Ex. 18, at 1 (Recital C), § 1.1. It specifies that Vi3 owns the Valmarc Total Vision System ("VTVS"), while Converse owns "Developments delivered or created pursuant to" the agreement. *See id.* at 1 (Recital A), §§ 2.4, 11.4. This Court determines that there are genuine disputes of material fact such that a reasonable jury could find that the trade secrets at issue in this case are a component of the VTVS predating the MSLA, making summary judgment inappropriate on ownership.

Section 11.4 of the MSLA provides that "Converse owns all Developments delivered or created pursuant to [a] Statement of Work" between the parties. ECF 206-18, Ex. 18, § 11.4. "Developments" are defined in Exhibit A to the MSLA as: "(i) all Deliverables, and (ii) all Foreground [Intellectual Property Rights ("IPR")]; but expressly excludes any and all Valmarc Property or Converse Property." *Id.* at 17.

The first type of Development Converse owns is "all Deliverables," which is defined as "the Work Product to be delivered by Valmarc." *Id.* Work Product is itself defined as:

> [A]ll work product (including but not limited to the results and proceeds of all Services) conceived, reduced to practice, created or developed pursuant to this Agreement, including but not limited to specifications, designs, formulas, test results, reports, samples, prototypes, components, processes, procedures and tangible embodiments of IPR.

*Id.* at 19.

The second type of Development that Converse owns is "Foreground IPR," which is any intellectual property rights "jointly developed by Converse and Valmarc under this Agreement," but excluding any "Valmarc Property." *Id.* at 17. "Valmarc Property" is defined as "all Intellectual Property Rights conceived, created, developed, or reduced to practice by Valmarc Independently of (i) this Agreement, (ii) any Statement of Work, or (iii) any other work

PAGE 28 – OPINION ON SUMMARY JUDGMENT

performed by Valmarc with funding provided by Converse." *Id.* § 11.1. The MSLA also specifically provides that it does not transfer to Converse any "right, title, or ownership of [IPR] to the [VTVS], the Valmarc Software, or the Documentation." *Id.* § 2.4. The VTVS includes both Valmarc and third-party software, as well as any documentation, including "any additions or modifications under this Agreement," used "to assist brand owners with inventory track and trace, brand protection, logistics, visibility, and user interfaces." *Id.* at 1 (Recital A). "Documentation" is further defined as "any written instruments, user and technical manuals, reference guides, training materials, release notes, installation notes, descriptions, specifications, and any other materials, in paper, electronic or any other form, that describe the requirements, features, functions, support, maintenance and/or use of the [VTVS]." *Id.* at 17.

### 2. The Parties' Arguments

Defendants argue Vi3 and Converse jointly developed what Vi3 now allege are trade secrets, making them "Developments" that Converse owns. MSJ, ECF 205 at 24. They argue that Converse's payment of over $15 million to Vi3 "to fund the development and improvements" to the VTVS, Converse's direction and feedback regarding specifications for the system, and the importance of Converse's "knowledge, insights, and specifications" to the VTVS show that it was jointly developed under the MSLA. *Id.* at 20. Defendants also set forth various Statements of Work that they allege show Converse's ownership of each asserted trade secret, *see id.* at 26–33, and argue that Vi3 "has no evidence that it developed any of its alleged trade secrets independent of its relationship with Converse and without any Converse funding," *id.* at 25.

Vi3 argues that "the VTVS as defined in the 2015 MSA is the same system that encompasses and relies on the trade secrets in this case," a system which was developed prior to, and independently of, its relationship with Converse. Resp., ECF 213 at 31. It argues that the MSLA's description of the VTVS as including both proprietary and third-party software, as well

as various types of documentation, is sufficiently broad to encompass its trade secrets. *Id.* It also points out that the language describing the VTVS includes "additions or modifications under this Agreement or any Statement of Work." ECF 206-18, Ex. 18 at 1 (Recital A). Finally, Vi3 argues Defendants' reading of the MSLA is inconsistent with other provisions of the agreement. *See* Resp., ECF 213 at 33–35.

### 3. This Court's Ruling

Genuine disputes of material fact remain regarding whether Vi3's trade secrets were a part of the VTVS predating the MSLA or were developed together with Converse. A reasonable jury could find that substantial elements of the VTVS predated Vi3's relationship with Converse. *See, e.g.*, ECF 214-117, Ex. 252 (presentation in February 2011 on Vi3's system, including ██████████████████████████████████████████); ECF 214-114, Ex. 249 at 10 (2009 presentation describing "████████████████████" system); ECF 214-115, Ex. 250 (similar 2010 presentation).

A reasonable jury could likewise understand the MSLA to define the VTVS as including the trade secrets in this case. *See, e.g.*, ECF 214-113, Ex. 248 at 3 (Converse in-house counsel stating "Developments" in § 11.4 was not meant to refer to "implementation of an existing Valmarc system"). And the jury could find that, to the extent Converse and Vi3 jointly developed various components of the VTVS, that these constituted only "additions or modifications" belonging to Vi3. *See* ECF 206-18, Ex. 18 at 1 (Recital A); *see, e.g.*, MSJ, ECF 205 at 20 (stating Converse "fund[ed] the development and *improvements*" to the VTVS (emphasis added)).

Vi3 has also produced evidence by which a reasonable jury could find that Defendants treated Vi3 as the owner. Nike sought to license the system from Vi3, which would be unnecessary if Converse, Nike's subsidiary, owned all the trade secrets involved. *See, e.g.*, ECF

PAGE 30 – OPINION ON SUMMARY JUDGMENT

214-120, Ex. 255 (Nike requesting pricing for a licensing agreement); ECF 206-68, Ex. 67 at 4 (Vi3 describing its system as "based on Valmarc-owned intellectual property" and stating that it would "provide all appropriate licenses to Nike for Nike's use"). Some evidence also shows that Converse treated Vi3 as the owner of its system. *See, e.g.*, ECF 214-122, Ex. 257 at 2 (email from Converse referring to "the inner workings of [Vi3's] system" as "proprietary intellectual property"); ECF 214-180, Ex. 315 at 2 (email from Converse stating that "[h]ardware and scanners are owned by Converse but the software is proprietary to Vi3").

Defendants argue that Vi3's offer to purchase "the Converse Valmarc system" from Converse proves Converse owns Vi3's trade secrets. MSJ, ECF 205 at 35; *see* ECF 206-12, Ex. 12 at 3 (Vi3's offer to "buy back" the joint system). However, that same offer maintained that Vi3 owned certain "Brand Protection" intellectual property that it sought to license to Nike. ECF 206-12, Ex. 12 at 3. And Vi3 argues the emails related only to buying back the hardware Converse purchased and the ownership of future Developments under the 2015 MSLA. *See, e.g.*, Howes Dep., ECF 214-83, Ex. 218 at 20–21 ("The offer was prompted to buy back the hardware."); ECF 214-180, Ex. 315 at 2.

Because a reasonable jury could find, based on the text of the MSLA and other evidence in the record, that Vi3 owns the asserted trade secrets, genuine disputes of material fact remain as to ownership.

## D. Description and Use of the Trade Secrets

Defendants' final argument is that Vi3 fails to describe any of its eight asserted trade secrets with sufficient particularity or that Defendants did not use any of those trade secrets. MSJ, ECF 205 at 49. This Court finds that genuine issues of material fact remain as to both questions. Summary judgment is thus inappropriate on these issues.

### 1. Vi3's Description of Trade Secrets

A trade secret plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *InteliClear*, 978 F.3d at 658 (cleaned up). "Trade secrets cannot be vague concepts," *Calendar Rsch. LLC v. StubHub, Inc.*, No. 17-cv-04062, 2020 WL 4390391, at *6 (C.D. Cal. May 13, 2020), general categories, catchall phrases, or merely citations to documents "that purportedly reference or reflect the trade secret information." *InteliClear*, 978 F.3d at 658. But "[r]easonable particularity does not require a party to define its trade secret down to the finest detail or require a mini-trial on misappropriation." *TelSwitch, Inc. v. Billing Sols. Inc.*, No. C 12-00172, 2012 WL 3877645, at *3 (N.D. Cal. Sept. 6, 2012). A trade secret is described with sufficient particularity when it allows the defendant to "determine whether the information in question was in fact secret and whether it was in fact readily ascertainable through appropriate means." *Jamison v. Olin Corp.-Winchester Div.*, No. 03-1036-KI, 2005 WL 7213837, at *9 (D. Or. Oct. 4, 2005), *report & recommendation adopted*, 2005 WL 2897036 (D. Or. Nov. 3, 2005).

At summary judgment, the plaintiff's burden "is only to identify at least one trade secret with sufficient particularity to create a triable issue." *InteliClear*, 978 F.3d at 659; *see, e.g.*, *Rebecca Bamberger Works, LLC v. Bamberger*, No. 24-CV-706, 2024 WL 2805323, at *8 (S.D. Cal. May 31, 2024). "Where conflicting inferences may be drawn from the facts, the case must go to a jury." *InteliClear*, 978 F.3d at 660 (quoting *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 818 (9th Cir. 2014)).

Defendants argue Vi3 has failed to define its alleged trade secrets with sufficient particularity, arguing that Vi3 characterizes its trade secrets as "unspecified 'processes,' 'methods,' 'algorithms,' 'architecture,' 'applications,' and 'know-how,' without ever identifying

what those processes, methods, algorithms and other things are, much less defining them in a particularized manner." MSJ, ECF 205 at 45–46. They also highlight testimony from Vi3 employee Eric Johanson describing the trade secrets, including the design, ideas, and "flows of data," as existing at the "10,000-foot view." Johanson Dep., ECF 206-125, Ex. 124 at 19.

For its part, Vi3 argues that the evidence in the record shows that both everyone "[o]utside this litigation" and the experts and witnesses "[w]ithin this litigation"—including Defendants—"understood the defining features of Vi3's brand protection system and how they worked. *Id.* Vi3 argues Converse not only understood how Vi3's system operated and that Vi3 had trade secrets, but also "touted the system's effectiveness." *Id.* at 51–52. Vi3 argues Nike also understood how its system worked and that it was confidential, as evidenced by Nike's due diligence and evaluation of Vi3's system in deciding whether to use it for itself. *See id.* at 52–53. And, according to Vi3, Nike developed a more in-depth understanding of the system after Converse shared the system—including the trade secrets—to Nike. *Id.* at 53.

This Court finds that there is a genuine issue of material fact as to whether Vi3 has defined its trade secrets with sufficient particularity. Vi3 produced "Exhibit A," a response to Defendants' interrogatories, which lists the trade secrets, provides a description of each, and lists supporting documentation in the record. ECF 206-39, Ex. 38A, at 39–44. This exhibit describes key components of Vi3's system and how its processes for aggregating data and detecting counterfeit products. *See, e.g.*, *id.* at 39–40 (describing several steps of Vi3's "technical processes for generating ███████████ and transmitting them to different parts of a consumer goods company"); *cf. InteliClear*, 978 F.3d at 659 (concluding plaintiff satisfied particularity requirement for purposes of summary judgment by identifying aspects of its program's logic and architecture). Vi3's Exhibit A is not merely a list of catchall phrases or scattered references to

the record; it identifies tangible trade secret material associated with each of the categories of trade secrets. This is sufficient to withstand summary judgment.

In addition to Exhibit A, other evidence in the record could allow a reasonable jury to find that Vi3 described at least one of its trade secrets with sufficient particularity. This evidence includes documents describing Vi3's system that Vi3 provided to Nike, *see* Resp., ECF 213, at 52–54, Nike employees' deposition testimony describing how Vi3's trade secrets operate, *see id.* at 54–55, Johanson's deposition testimony describing Vi3's trade secrets, *see id.* at 55, and experts' reports on the trade secrets based on Exhibit A and "accompanying documentation," *see id.* at 56–57. Vi3's burden is only to identify at least one trade secret with sufficient particularity to create a triable issue. Drawing all reasonable inferences in Vi3's favor, this Court finds that Vi3 has done so.

### 2. Defendants' Use of Trade Secrets

Vi3 must show Defendants "misappropriated" Vi3's trade secrets. *InteliClear*, 978 F.3d at 657–58. Under the DTSA and OTSA, "misappropriation" means either (1) the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or (2) the "disclosure or use of a trade secret of another without express or implied consent" by a person who acquired it through improper means or knew it was acquired through improper means. 18 U.S.C. § 1839(5); O.R.S. 646.461(2). "Use" of a trade secret means "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant." *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010) (quoting Restatement (Third) of Unfair Competition § 40 (Am. L. Inst. 1995)). Examples of "use" include marketing goods encompassing the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret in research or development, or soliciting customers through information that is a trade secret. *Id.*

PAGE 34 – OPINION ON SUMMARY JUDGMENT

Defendants argue that Nike's CP system does not use Vi3's trade secrets. MSJ, ECF 205 at 48. They argue that Vi3 only asserts that Nike's CP system is "similar" to Vi3's system "at a high level of generality," and has failed to prove that the "technical features of [Vi3's] alleged trade secret software, applications, and system show 'substantial similarities' to Nike's system." *Id.* at 49.

Vi3 responds that Defendants' "substantial similarity" standard is legally incorrect and too narrow. Resp., ECF 213 at 61–62. Under the broader standard of "use," which includes relying on a trade secret in research and development, Vi3 argues that Nike used its trade secrets by extensively studying Vi3's system and "put[ting] that knowledge to work" in developing Nike's CP system. *Id.* at 11, 61–62; *see, e.g.*, ECF 214-49, Ex. 184 at 4 (comparing features of Vi3's system and Nike's proposed in-house system). Additionally, Vi3 argues that a genuine dispute exists even under a "substantial similarity" test because experts hired by the parties "came to very different conclusions regarding the similarity of the two systems." Resp., ECF 213 at 62–63.

This Court finds that there are genuine disputes of fact regarding Defendants' use of Vi3's trade secrets. First, Vi3 has produced evidence by which a reasonable jury could find that Nike employees used their knowledge of Vi3's system to develop the CP system, thereby exploiting the trade secret information. *See id.* 13–14. Such evidence includes statements from Nike's own employees that Nike "basically took Converse design and copied it." ECF 214-2, Ex. 137 at 6; *see also* ECF 214-56, Ex. 191 (email from Foley offering to "demo the [Valmarc-Converse] system as a starting point").

Vi3 has also produced evidence by which a reasonable jury could find that the CP system is substantially similar to the Vi3 System. There are examples of Nike employees themselves

advocating for Nike to build a system similar to Vi3's: "In evaluating the platform that Valmarc created for Converse, the Nike Technology team is confident in the ability to build a comparable, yet similar, system." ECF 214-54, Ex. 189 at 5. Nike leadership approved this proposal. *Id.* at 2. Further, Vi3 has presented rebuttal evidence that Nike's CP system encompasses aspects of each asserted trade secret.

### a. Overall Architecture and ███████████ (Trade Secrets 1 & 2)

Vi3 has produced evidence that Nike considered Vi3's "overall architecture" in developing the CP system. *See* Resp., ECF 213 at 51, 63. For example, Nike employees reviewed Vi3's "overall architecture" in a meeting about adding functionality to CP. ECF 214-63, Ex. 198 at 0:10-:30; *see also* ECF 214-140, Ex. 275 (presentation Converse employees shared with Nike showing the features of the Vi3 system).

It has also produced evidence creating a triable issue of fact regarding whether CP uses

███████████████████████████████████████

███████████████████████████████████████

███████████████████████ which Vi3 then references to authenticate products. *See* ECF 206-129, Ex. 128 at 12–15. ██████████████████████████

███████ and point to Nike expert testimony confirming as much. MSJ, ECF 205 at 54; *see* ECF 206-131, Ex. 130, at 61. In rebuttal, Vi3's expert found "at least three different ways in which Nike's system includes ████████ features," including a ████████████

██████████████████████████████████. Report of Dr. Michael Mitzenmacher ("Mitzenmacher Report"), ECF 214-163, Ex. 298 at 4. Some versions of CP also ███████████████████████████████████

███████ similar to Vi3's system. *Id.* There is also evidence that Nike employees referenced Vi3's ████████ in rolling out CP. *See, e.g.*, ECF 214-59, Ex. 194 at 9–10 (referencing the

PAGE 36 – OPINION ON SUMMARY JUDGMENT

█████████ process employed by Converse and suggesting it be adapted and applied "across the broader Nike product landscape").

### b. Methods for Generating ████████████ (Trade Secrets 3 & 4)

Trade secrets 3 and 4 concern Vi3's methods for generating ████████████, typically ████████████████, and transmitting that data. Vi3 has produced evidence by which a reasonable jury could find that CP's ██████████ and methods for generating ██████ ████████ are similar to Vi3's system. Defendants argue the concept of applying ████████████ ████████ to products was either "well known before Valmarc first spoke with Converse or not used by Defendants." MSJ, ECF 205 at 57. But the trade secrets Vi3 describes include not just the concept of ████████████, but also the methods and process of generating and assigning those ██████ in a way that cannot easily be reverse-engineered by counterfeiters. *See* ECF 206-39, Ex. 38A at 41 (trade secret 4). Defendants also maintain its ████████████ contain different components and are generated differently from Vi3's. MSJ, ECF 205 at 59–60. Vi3 argues the content and structure of the ████████████ in both systems are substantially similar. Resp., ECF 213 at 64. Dr. Mitzenmacher's expert report identifying similarities between Vi3's ████████ generation methods and Nike's equivalent, *see* ECF 214-163, Ex. 298 at 5–8, is enough to create a genuine issue of triable fact regarding Defendants' misappropriation of trade secrets 3 and 4.

### c. Business Rules and Methods for Analyzing Data and Identifying Suspect Activity (Trade Secrets 5, 6, & 7)

Trade secrets 5 through 7 concern Vi3's methods for analyzing data ████████████ ████████ and identifying potential suspect activity. Trade secret 5 includes Vi3's software for ████████████████████████████████. ECF 206-39, Ex. 38A at 41. Trade secret 6 details Vi3's "business rules" ████████████████████████████████████████████ ████████████████████████████." *Id*. at 42. Trade secret 6 also includes a "hierarchy" Vi3

applies to evaluate those business rules and methods for querying its database to analyze ███

███. *Id.* Trade secret 7 involves Vi3's VTV mobile and desktop interfaces for reporting data

from its database. *Id.* at 43.

Defendants argue, based on the deposition testimony of Eric Johanson, that Nike's CP

system uses neither Vi3's business rules nor its hierarchy for evaluating those rules. MSJ, ECF

205 at 64–65; *see* Johanson Dep., ECF 206-125, Ex. 124 at 39, 49–50. But Johanson's testimony

explains that he believed the business rules were "in the heads of the users of the system" rather

than its code. *Id.* at 39. And Dr. Mitzenmacher's expert report concludes that Nike's CP system

implemented practices consistent with ████████████. Mitzenmacher Report, ECF 214-

163, Ex. 298 at 9. This is enough to create a triable issue of fact on whether Nike's CP system

used these trade secrets.

### d.  Knowhow (Trade Secret 8)

Finally, trade secret 8 concerns Vi3's "knowhow . . . about how to implement an

anticounterfeiting sterilization system, including its business processes related to ██████████

management, label printing, factory operations, and business rule development and

modification." ECF 206-39, Ex. 38A at 43.

Defendants argue, citing deposition testimony, that it did not use this trade secret

information either. MSJ, ECF 205 at 67–68. This Court fails to see how most of the cited

deposition testimony supports Defendants' argument.[6] Either way, Vi3 has identified evidence of

---

[6] For example, in his May 16, 2024, deposition, Eric Johanson testified not that Nike *did not* use the identified trade secret information, only that he did not know whether they did or not. *See* ECF 206-125, Ex. 124 at 51–53 ("I'm not prepared to say. Some of them I don't know, so I can't say with certainty that any of those bullets are used. . . . I don't know about the next one. . . . That one I don't know. . . . Whether some—any of those processes or things were used in Nike's final system, I don't know.").

at least one example that a jury could find supports its claim for misappropriation of trade secret 8. Vi3 argues its process of generating ███████████ ███████████████ ██████ Vi3's expert Eric Johanson described ████████████████████████ ████████████████████████████████████████ Expert Report of Eric Johanson, ECF 214-135, Ex. 270 § 4.4.2.e. Vi3 argues that Nike's decision to develop CP to ████████████████████████████████ █████████████████████████ is evidence of misappropriation because Nike allegedly used an idea it learned from Vi3 as a starting point. Resp., 213 at 64. Vi3 supports this argument with expert testimony describing the CP system for generating ████ ████. *See* Mitzenmacher Report, ECF 214-163, Ex. 298 at 5–8. With this, a reasonable jury could find that Defendants relied on Vi3's knowhow in developing the CP system.



## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment, ECF 205, is DENIED. The timeliness of Vi3's lawsuit, Vi3's confidentiality measures, ownership of the trade secrets, the adequacy of Vi3's description of the trade secrets, and Defendants' alleged misappropriation of the trade secrets are all issues of fact for a jury to decide at trial.

**IT IS SO ORDERED.**

DATED this 18th day of November, 2024.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge